**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

WP CO., LLC,
d/b/a THE WASHINGTON POST,
               *Plaintiff*,
     v.
NATIONAL HIGHWAY TRAFFIC
SAFETY ADMINISTRATION,
               *Defendant*,

    *and*

TESLA, INC.,
              *Intervenor-*
             *Defendant*.

Civil Action No. 24-cv-1353 (TSC)

**TESLA'S MEMORANDUM IN SUPPORT OF ITS**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

STANDARD OF REVIEW ......................................................................................................7

ARGUMENT...........................................................................................................................8

I.      The Requested Information Is Shielded From Disclosure By Exemption 4........................9

     a.      The information is commercial or financial..............................................................9

     b.      The information was obtained from a person .........................................................11

     c.      The information is confidential...............................................................................11

II.     Disclosure Of The Requested Information Would Foreseeably Harm Tesla ....................14

CONCLUSION.......................................................................................................................18

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*American Small Business League v. U.S. Department of Defense*,
411 F. Supp. 3d 824 (N.D. Cal. 2019) ...................................................................................15

*Associated Press v. Federal Bureau of Investigation*,
265 F. Supp. 3d 82 (D.D.C. 2017) .......................................................................................7, 8

*Baker & Hostetler LLP v. U.S. Department of Commerce*,
473 F.3d 312 (D.C. Cir. 2006) .............................................................................................9, 10

*Citizens for Responsibility and Ethics in Washington v. U.S. Department of
Commerce*, No. 1:18-CV-03022 (CJN), 2020 WL 4732095 (D.D.C. Aug. 14,
2020) .....................................................................................................................................13

*Citizens for Responsibility and Ethics in Washington v. U.S. Department of
Justice*, 58 F.4th 1255 (D.C. Cir. 2023)............................................................................8, 9, 10

*Citizens for Responsibility and Ethics in Washington v. U.S. Department of
Justice*, 728 F. Supp. 3d 113 (D.D.C. 2024)......................................................................16, 17

*Critical Mass Energy Project v. Nuclear Regulatory Commission*,
830 F.2d 278 (D.C. Cir. 1987) ..............................................................................................10

*Critical Mass Energy Project v. Nuclear Regulatory Commission*,
975 F.2d 871 (D.C. Cir. 1992) ..............................................................................................11

*Center for Auto Safety v. National Highway Traffic Safety Administration*,
244 F.3d 144 (2001).............................................................................................................12

*Food Marketing Institute v. Argus Leader Media*,
588 U.S. 427 (2019)...........................................................................................11, 13, 14, 15, 18

*Gardels v. Central Intelligence Agency*,
689 F.2d 1100 (D.D.C. 1982) ...............................................................................................8

*Judicial Watch, Inc. v. U.S. Department of Justice*,
No. 19-CV-800 (TSC), 2020 WL 5798442 (D.D.C. Sept. 29, 2020).....................................18

*Occupational Safety and Health Law Project, PLLC v. U.S. Department of Labor*,
No. 1:21-CV-2028-RCL, 2022 WL 3444935 (D.D.C. Aug. 17, 2022)...................................18

*Organization for Competitive Markets v. Office of Inspector General, USDA*,
No. 14-CV-1902 (EGS), 2024 WL 4753818 (D.D.C. Nov. 12, 2024)...................................18

*People for the Ethical Treatment of Animals v. U.S. Department of Health and Human Services*, 901 F.3d 343 (2018)..................................................................................18

*Public Citizen Health Research Group v. Food and Drug Administration*, 704 F.2d 1280 (D.C. Cir. 1983) ................................................................................8, 9, 10

*Renewable Fuels Association v. U.S. Environmental Protection Agency*, 519 F. Supp. 3d 1 (D.D.C. 2021) ...........................................................................................13

*Reporters Committee for Freedom of the Press v. Federal Bureau of Investigation*, 548 F. Supp. 3d 185 (D.D.C. 2021) ..............................................................17, 18

*Rural Cellular Association v. Federal Communications Commission*, 588 F.3d 1095 (2009).................................................................................................16

*Shteynlyuger v. Centers for Medicare and Medicaid Services*, 698 F. Supp. 3d 82 (D.D.C. 2023) ......................................................................................15

*Sunoco Pipeline, L.P. v. U.S. Department of Transportation*, No. 21-CV-1760 (TSC), 2023 WL 11195824 (D.D.C. Sept. 29, 2023) ...........................10, 11

*Wilson v. FCC*, No. 21-CV-895-RMM, 2022 WL 4245485 (D.D.C. Sept. 15, 2022) ......................................13

*Wolf v. Central Intelligence Agency*, 473 F.3d 370 (D.C. Cir. 2007) .......................................................................................8

**Federal Statutes**

5 U.S.C.
   § 551................................................................................................................................11
   § 552.......................................................................................................................8, 9, 15

**Other Authorities**

Dep't of Justice, *DOJ Guide to the FOIA, Exemption 4* (Jan. 29, 2025), https://www.justice.gov/oip/media/1386526/dl?inline ........................................................11

Tesla, *Autopilot and Full Self-Driving (Supervised)*, https://www.tesla.com/support/autopilot (last visited April 2, 2024)......................................2

**INTRODUCTION**

Tesla Inc. (Tesla) is a pioneer in the electric vehicle revolution and has engineered market-leading advanced driver-assistance systems (ADAS).  As an industry leader, Tesla maintains its competitive position by constantly assessing how to improve its revolutionary technology.  In its ordinary course of business, Tesla collects data about its systems and investigates any reportable incidents and prepares the Incident Reports at issue here.  The contents of certain categories of information in these Reports are highly confidential, and Tesla treats them as such, as their disclosure would put Tesla at a competitive disadvantage.  Nonetheless, Tesla is obligated to report certain vehicle incidents and associated confidential data to the National Highway Traffic Safety Administration (NHTSA).  If not for its regulatory obligations, Tesla would not disclose this information.

Much of the information contained in the Incident Reports is publicly released.  But NHTSA itself recognizes that certain categories of information required to be submitted in these Incident Reports may contain confidential business information.  These categories include information about the hardware and software of the vehicle, the operating environment of the vehicle during the time of the incident, and a narrative of the incident that contains detailed information about the vehicle and the technology deployed.  With each submission Tesla makes to NHTSA, Tesla requests confidential treatment for these categories.  Plaintiff *The Washington Post* submitted a FOIA request seeking Tesla's confidential business information, including the categories of information that NHTSA and Tesla have determined are confidential and shielded from disclosure.  NHTSA has rightly withheld the requested information under FOIA Exemption 4.  Plaintiff filed suit, seeking a declaratory judgment and injunctive relief that would require NHTSA to produce the information unredacted.  Tesla moved to intervene as a defendant,

arguing that the requested information is confidential information that Tesla treats as private and could harm Tesla's competitive and commercial business interests.  This Court concluded that Tesla was entitled to intervene as of right and granted Tesla's motion, recognizing that "Tesla has an interest in preventing the disclosure of its confidential information."  Order at 6, Dkt. 19.

Because Plaintiff seeks confidential commercial information, the disclosure of which would cause commercial or financial harm, this Court should reject Plaintiff's attempt to require the disclosure of the protected information.  Tesla and NHTSA's Motions for Summary Judgment should be granted, and Plaintiff's forthcoming Motion for Summary Judgment should be denied.

## BACKGROUND

### I.      Tesla's Market-Leading ADAS Technology

Tesla is a leader in the global automobile industry and the electric vehicle revolution. Tesla manufactures and sells five high-performance, fully electric vehicles:  The Model S, Model X, Model Y, Model 3, and Cybertruck.  *See* Statement of Undisputed Facts ("Statement") ¶ 2. Tesla has also engineered ADAS systems using primarily vision-based technologies and neural networks (artificial intelligence).  *See id.* ¶ 3.  Tesla's ADAS, including its Autopilot and Full Self-Driving (Supervised) packages, offer consumers a suite of advanced driver-assistance features.  *See id.* ¶ 6. [1]  Tesla's ADAS consist of hardware and software, and Tesla vehicles receive over-the-air updates that allow Tesla to constantly improve its driver-assistance

---

[1] Tesla's public website contains descriptions of Tesla's Autopilot and Full Self-Driving (Supervised) packages and the available features.  *See* Tesla, *Autopilot and Full Self-Driving (Supervised)*, https://www.tesla.com/support/autopilot (last visited April 2, 2024); *see also* Ex. 1, April 2, 2025 Decl. of Eddie Gates in Supp. of Tesla's Mot. for Summ. J. ("Gates Decl.") ¶¶ 8-10.  Tesla formerly offered an intermediate ADAS package, Enhanced Autopilot, the underlying features of which are now included with the Full Self-Driving (Supervised) package.  *See* Ex. 1, Gates Decl. ¶ 7.

2

offerings.  *See* Ex. 1, Gates Decl. ¶28.  Tesla's Autopilot features come standard with every Tesla vehicle, while the features comprising Full Self-Driving (Supervised) can be added for an additional cost.  *See id.* ¶¶ 8-9.

Tesla believes its capabilities related to Full Self-Driving (Supervised) are more advanced than its competitors' ADAS capabilities.  *See* Statement ¶ 6; Ex. 1, Gates Decl. ¶ 11. For instance, a Tesla driver can engage and use Full Self-Driving (Supervised) anywhere in the United States, including on city streets in urban areas, and no other manufacturers offer comparable technology for production-level vehicles.  *See* Gates Decl. ¶11.  Tesla vehicles with Full Self-Driving (Supervised) are capable of navigating stop signs, traffic lights, roundabouts, and all manner of city traffic, unlike other manufacturers' production-level vehicles.  *Id.*  Tesla regards these as unique ADAS features that distinguish Tesla from its competitors and it closely guards information about these proprietary technologies.  Statement ¶ 6; Ex. 1, Gates Decl. ¶11.

## II.    Tesla's Reporting to NHTSA Under the SGO

In June 2021, NHTSA issued Standing General Order 2021-01 ("SGO"), which requires vehicle manufacturers such as Tesla to submit Incident Reports that document certain vehicle incidents when an SAE Level 2 ADAS system was engaged, or alleged to have been engaged, at the time of a safety critical event or shortly before. [2]  Statement ¶¶ 12–14; *see also* Ex. 1, Gates Decl. ¶¶ 4, 6; Compl. ¶ 23, Dkt. No. 1; *see also* Compl. Ex. 1, SGO at 6.  Tesla must report, for example, the make, model, and year of the vehicle; the location of the incident; and other details

---

[2] SAE International, a standards-development organization, has established levels of driving automation.  SAE levels range from 0 to 5, with each level indicating a greater level of autonomy.  Statement ¶ 7; Ex. 1, Gates Decl. ¶ 13.  Tesla's Autopilot and Full Self-Driving features are SAE Level 2, which requires constant driver supervision.  Statement ¶¶ 5, 9; Ex. 1, Gates Decl. ¶ 13.  The SGO also requires manufacturers to report accidents involving Automated Driving Systems (ADS), but Tesla currently does not offer ADS in any of its production vehicles.  Statement ¶ 10; Ex. 1, Gates Decl. ¶ 6.

such as whether airbags deployed, whether injuries resulted, and whether property was damaged. Statement ¶ 14; Ex. 1, Gates Decl. ¶ 6; Compl. Ex. 2, Sample Incident Report.

Although most of the information in the Incident Report is publicly available, NHTSA has determined that manufacturers may classify three specific categories of information as "confidential business information" exempt from disclosure under FOIA: (1) the specific hardware and software versions of the ADAS/ADS with which a vehicle is equipped; (2) whether the vehicle was within its operational design domain (ODD) at the time of the incident; and (3) the manufacturer's narrative of the incident.  Statement ¶ 16; Ex. 1, Gates Decl. ¶ 18; Compl. Ex. 1, SGO at 14 ¶ 8 & App. B ¶ 1.

Information about the hardware and software versions includes the specific ADAS software system (*e.g.*, Autopilot, Enhanced Autopilot, or Full Self-Driving (Supervised)) in use and the relevant version, as well as the specific version of the hardware.  If released, this information would allow competitors to analyze the efficacy of Tesla's various hardware and software systems, draw conclusions about Tesla's rate of progress and otherwise evaluate or disparage Tesla's systems.  *See* Statement ¶ 23; Ex. 1, Gates Decl. ¶¶ 20, 29.

As for the ODD field, "ODD" generally refers to the operating environment of an autonomous system.  As applied to autonomous vehicles, ODD refers to the set of conditions— including environmental, geographical, traffic, roadway characteristics, and so forth—within which the vehicle is designed to safely operate.  Currently, ADS systems and the ADAS systems offered by Tesla's competitors are permitted to only operate in certain locales or on certain roads, and those limitations define those vehicles' ODD.  Statement ¶ 24; Ex. 1, Gates Decl. ¶ 30.  But unlike other manufacturers, Tesla's ADAS systems are engineered to operate on any roadway in which the car is capable of driving under the active supervision of a driver, and so—

4

unlike systems that operate only in certain locales or roads—the ODD for a Tesla vehicle is essentially any roadway in America in which the driver is comfortable. Statement ¶ 24. Tesla's redacted ODD responses on the Incident Report therefore refer to and are intertwined with the narrative. *Id.*

Regarding the narrative portion of the Incident Report, it includes information and metrics Tesla collects about the events leading up to and including the incident, including speed, location and direction, and road conditions. Statement ¶ 25; Ex. 1, Gates Decl. ¶ 31. It may also include detailed information related to individual driver behavior and decision making, including the election to drive faster than posted speed limits, accelerator pedal input, brake pedal input, steering input, and other metrics that disclose the driver's behavior leading up to a reportable incident. Statement ¶ 26; Ex. 1, Gates Decl. ¶ 33. This characterization could implicate driving behavior as possibly being responsible for an accident. As set out in Tesla's Privacy Notice to its consumers, Tesla considers these inputs and driving behavior to be private and confidential and treats that information as such. If ordered released, customers will be less likely to permit their driving activity for safety investigations. Statement ¶ 26; Ex. 1, Gates Decl. ¶ 33. Moreover, the narrative often reflects Tesla's preliminary and confidential assessments of safety critical incidents and may be subject to change. Statement ¶ 25; Ex. 1, Gates Decl. ¶ 34.

In short, Tesla treats each of these three categories of information as confidential, technical, and proprietary. Statement ¶ 27; Ex. 1, Gates Decl. ¶ 19. Within Tesla, access to the Incident Reports is provided only to certain employees who need access as part of their job function, such as the Director for Field Reliability Engineering, the accident investigation team, Autopilot subject matter experts specific to accident investigation and regulatory reporting, and certain members of the legal department. Employees with access to the Incident Reports or the

information contained within the Incident Reports are subject to non-disclosure agreements and associated security protocols directed at preventing dissemination of this information outside of Tesla.  Statement ¶ 28; Ex. 1, Gates Decl. ¶ 22.  If not for the SGO's regulatory obligations, Tesla would not voluntarily disclose this information to anyone outside Tesla (in the absence of a non-disclosure agreement).  Statement ¶¶ 27-28; 33; Ex. 1, Gates Decl. at ¶ 17.

### III.    Tesla's Requests for Confidentiality

Tesla has provided and continues to provide these three categories of information to NHTSA with the understanding and expectation—based in part on the terms of the SGO and NHTSA's practice in granting Tesla's confidentiality requests—that this information will remain confidential.  *See, e.g.*, Statement ¶¶  29, 41; Ex. 1, Gates Decl. ¶ 23.  When submitting Incident Reports, Tesla requests confidential treatment under FOIA Exemption 4 and selects the "CBI" designation in each form for the three categories discussed above.  Statement ¶ 40.  Tesla also submits cover letters with its Incident Reports requesting confidential treatment for the submissions.  Statement ¶¶ 30-31; Ex. 3, June 02, 2022 Tesla Request for Confidentiality; Compl. Ex. 6, Aug. 13, 2021 Tesla Request for Confidentiality.  The cover letters note that the Incident Reports contain information that is proprietary, confidential, and otherwise not publicly available.  Statement at ¶ 31; Ex. 1, Gates Decl. ¶ 23, Compl. Ex. 6, Aug. 13, 2021 Tesla Request for Confidentiality.  Tesla also asserts that the information is entitled to confidential treatment because it would cause competitive harm to Tesla, including by revealing how Tesla's software and vehicle technology work.  Statement ¶ 32; Ex. 1, Gates Decl. ¶ 23; Ex. 3, 2022-06-02 Tesla Request for Confidentiality; Compl. Ex. 6, Aug. 13, 2021 Tesla Request for Confidentiality. When Tesla submits Incident Reports to NHTSA, it submits two versions: an unredacted version for use by NHTSA, and a redacted version that can be released in response to valid FOIA

6

requests.  Statement ¶ 19; Ex. 1, Gates Decl. ¶ 23; Compl. Ex. 6, Aug. 13, 2021 Tesla Request for Confidentiality.

NHTSA has routinely responded to and granted Tesla's requests for confidential treatment but has denied Tesla's requests as to certain narrow pieces of information in the narrative portion of some Incident Reports (such as the sources of incident information and information about available data).  Statement ¶ 41.

## IV.    Plaintiff's Attempts To Access Tesla's Confidential Business Information

Plaintiff here submitted a FOIA request to NHTSA seeking Tesla's confidential business information.  It requested "NHTSA's Level 2 ADAS incident report data spreadsheet in unredacted format," and specifically sought the three categories of information that Tesla designated as its confidential business information.  Compl. Ex. 3, May, 30, 2023 Letter from Plaintiff.  NHTSA responded to Plaintiff's FOIA request by withholding the requested information under FOIA Exemption 4.[3]  *See* Compl. Ex. 4, Jan. 22, 2024 NHTSA Letter re Plaintiff's FOIA Request.  Plaintiff filed a complaint against NHTSA seeking Tesla's unredacted information.  According to Plaintiff, NHTSA improperly withheld multiple categories of incident-related information.  Compl. ¶¶ 5-6.  Shortly thereafter, Tesla moved to intervene in the lawsuit, Dkt. No. 7, and the Court granted the motion, Dkt. No. 19.

## STANDARD OF REVIEW

"FOIA cases are typically and appropriately decided on motions for summary judgment." *Associated Press v. Fed. Bureau of Investigation*, 265 F. Supp. 3d 82, 92 (D.D.C. 2017).

---

[3] As explained in NHTSA's Motion for Summary Judgment, NHTSA also invoked Exemption 6. Tesla's Motion focuses on the applicability of Exemption 4, but should the Court benefit from further information from Tesla related to Exemption 6, Tesla requests the opportunity to submit supplemental briefing.

Summary judgment is in turn "appropriate where the record shows there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Id.* at 91. Although an agency invoking a FOIA exemption to withhold information bears the burden of showing the withheld material fits the exemption, the justification for doing so "is sufficient if it appears 'logical' or 'plausible.'" *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982)). And where an affidavit "describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *Associated Press*, 265 F. Supp. 3d at 92.

## ARGUMENT

Exemption 4 of FOIA shields from disclosure records that contain "trade secrets and commercial or financial information obtained from a person and [are] privileged or confidential." 5 U.S.C. § 552(b)(4). Where "an agency withholds non-trade-secret information under Exemption 4, it must demonstrate that the withheld information is '(1) commercial or financial, (2) obtained from a person, and (3) privileged or confidential.'" *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.* ("*CREW*"), 58 F.4th 1255, 1262 (D.C. Cir. 2023) (quoting *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)). Plaintiff's requested information—information related to reportable Tesla vehicle incidents—satisfies each prong: the information is commercial or financial, obtained from Tesla, and confidential. Although the FOIA Improvement Act permits an agency to withhold information in only limited

8

circumstances, one of those circumstances is implicated here:  "the agency reasonably foresees that disclosure would harm an interest protected by [the] exemption."  5 U.S.C. § 552(8)(A)(i)(I).

## I.    The Requested Information Is Shielded From Disclosure By Exemption 4

### a.    The information is commercial or financial

The requested information—(1) the hardware and software versions of the ADAS/ADS equipped in a vehicle; (2) whether the vehicle was within its ODD at the time of the incident; and (3) the narrative of the incident—is indisputably commercial information.  "[U]nder Exemption 4, information must be commercial 'in and of itself,' meaning it serves a commercial function or is of a commercial nature."  *CREW*, 58 F.4th at 1263 (citation omitted).  The terms "commercial" and "financial" are given their "ordinary meanings."  *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290.

Commercial information typically involves records that "reveal basic commercial operations, such as sales statistics, profits and losses, and inventories, or relate to the income-producing aspects of a business." *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290; *see also CREW*, 58 F.4th at 1263 ("In enacting FOIA, Congress sought to shield from public release intrinsically valuable business information such as 'business sales statistics, inventories, customer lists, and manufacturing processes.'" (first quoting S. Rep. No. 89-813, at 9 (1965); then citing H.R. Rep. No. 89-1497, at 10 (1966)).  But the definition of commercial information is not confined to such records; "[t]he exemption reaches more broadly and applies (among other situations) when the provider of the information has a commercial interest in the information submitted to the agency."  *Baker & Hostetler LLP v. U.S. Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006); *see also CREW*, 58 F.4th at 1265 (commercial information includes data about commercial services, a product's favorable or unfavorable attributes, or information about a product's strengths and weaknesses) (citations omitted).

Here, the requested information easily satisfies the definition of "commercial." Information about software and hardware, the ODD at the time of the incident, and the narrative reveals capabilities about Tesla's commercial products (its vehicles and their ADAS capabilities), which are integral to Tesla's operations and the income-producing aspects of its business.  Tesla uses this data to assess performance and safety issues and to continually improve its features.  Statement ¶ 6; Gates Decl. ¶ 26.  Such "reports on its commercial service or its product's favorable or unfavorable attributes" and "information … gathered regarding its competitive strengths and weaknesses" is well within FOIA's definition of commercial information under Exemption 4.  *CREW*, 58 F.4th at 1265 (citations omitted).

That the information is aggregated and sent to NHTSA in no way detracts from the commercial nature of the information.  "The term commercial 'reaches ... broadly and applies (among other situations) when the provider of the information has a commercial interest in the information submitted to the agency.'"  *Sunoco Pipeline, L.P. v. U.S. Dep't of Transportation*, No. 21-CV-1760, 2023 WL 11195824, at *4 (D.D.C. Sept. 29, 2023) (omission in original) (quoting *Baker & Hostetler LLP*, 473 F.3d at 319 (D.C. Cir. 2006)).  It is well-established that entities have a commercial interest in information sent to regulators that may implicate health and safety or regulatory approvals.  *See, e.g.*, *Pub. Citizen Health Rsch. Grp.*, 704 F.2d at 1290 (health and safety data submitted by medical device manufacturers to FDA were commercial because manufacturers had had a "commercial interest" in the information itself, which "document[ed] ... the health and safety experience of their products" and would thus "be instrumental in gaining marketing approval for their products"); *Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 830 F.2d 278, 281 (D.C. Cir. 1987) (applying *Public Citizen* to hold commercial information included "details of the operations of … nuclear power plants, which

10

"could materially affect … profitability" and "commercial fortunes of … member utilities, and the vendors whose products are appraised in the … reports" because they "could be materially affected by the disclosure of health and safety problems experienced during the operation of nuclear power facilities"), *vacated on other grounds*, 975 F.2d 871 (D.C. Cir. 1992).  Indeed, this Court recently held that pipeline data "necessary for [a pipeline's] 'commercial operations and for commercial purposes,'" and used "to comply with 'federal pipeline safety regulations,' and to protect the structural integrity and security of the … pipeline" constituted commercial information.  *Sunoco Pipeline*, 2023 WL 11195824, at *4 (citations omitted) (holding in reverse-FOIA action seeking to enjoin the disclosure of information that plaintiff's allegations about its commercial information survived government's motion to dismiss).

In short, as the Department of Justice's authoritative treatise on FOIA has correctly explained, "[c]ourts have little difficulty finding information as 'commercial or financial' if it relates to business or trade."[4]  This Court should hold the same here.

**b.      The information was obtained from a person**

The requested information was also obtained from a person:  Tesla.  Tesla is a person under FOIA, which defines the term to "include[] an individual, partnership, corporation, association, or public or private organization other than an agency."  5 U.S.C. § 551(2); *see also* Statement ¶ 1 (Tesla is a corporation organized under the laws of Texas).  Tesla submits redacted and unredacted copies of the Incident Reports pursuant to its regulatory obligations under the SGO with an accompanying cover letter requesting confidential treatment.

**c.      The information is confidential**

---

[4] Dep't of Justice, *DOJ Guide to the FOIA, Exemption 4*, at 4 (Jan. 29, 2025), https://www.justice.gov/oip/media/1386526/dl?inline.

11

Although "confidential" is not defined in the FOIA statute, under the Supreme Court's framework in *Food Mktg. Inst. v. Argus Leader Media*, the term "confidential" in Exemption 4 carries the term's ordinary and common meaning of "private" or "secret." 588 U.S. 427, 434 (2019) (quoting Webster's Seventh New Collegiate Dictionary 174 (1963)). Information must be "customarily kept private, or at least closely held, by the person imparting it" to qualify as confidential. *Id.* That is the first requirement for information to be confidential under Exemption 4; indeed, it may be the only requirement for establishing confidentiality. *Id.* at 434-35 (declining to resolve the question whether "privately held information lose[s] its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private[]").

Tesla easily satisfies this requirement. Tesla treats as proprietary and does not publicly disclose any of the three categories of information. *See, e.g.*, Statement ¶¶ 23-25. Indeed, it is because the disclosure of this information can result in competitive harm to Tesla that it keeps it closely held. And for good reason: Tesla believes no other manufacturers offer comparable technology. Vehicles enabled with Full Self-Driving (Supervised) are capable of navigating stop lights, roundabouts, and city traffic, unlike the ADAS systems on other automobile manufacturers' production-level vehicles. Tesla regards these as unique ADAS features that distinguish it from its competitors. Information about these features can be discerned by the disclosure of the incident narratives, and so Tesla vigilantly keeps this information confidential. Statement ¶ 6; *Ctr. for Auto Safety v. NHTSA*, 244 F.3d 144, 148 (D.C. Cir. 2001) ("[I]n assessing customary disclosure, the court will consider how the particular party customarily treats the information, not how the industry as a whole treats the information."). Employees with access to the Incident Reports or the information contained in them are subject to non-disclosure

12

agreements and associated security protocols directed at preventing dissemination of this information outside of Tesla.  Ex. 1, Gates Decl. ¶ 22.  Tesla's evidence establishing that it does not "disclose" or "make [this information] publicly available 'in any way'" makes clear that there is "no question" that it satisfies the first requirement.  *Argus Leader*, 588 U.S. at 434.

Moreover, although the Supreme Court has not resolved whether government assurances of privacy are necessary under Exemption 4, *Argus Leader*, 588 U.S. at 434-35, courts in this Circuit have declined to "h[o]ld that 'privately held information lose[s] its confidential character for purposes of Exemption 4 if it's communicated to the government without' privacy assurances."  *Renewable Fuels Ass'n v. U.S. EPA*, 519 F. Supp. 3d 1, 12 (D.D.C. 2021) (second alteration in original) (quoting *Argus Leader*, 588 U.S. at 434); *see also, e.g.*, *Wilson v. FCC*, No. 21-CV-895, 2022 WL 4245485, at *10 (D.D.C. Sept. 15, 2022) (citing cases).  Instead, courts have reasoned that rather than "impos[ing] a blanket requirement that the government provide an assurance of privacy in every case in which it asserts Exemption 4," "[t]he better approach" is that "privately held information is generally confidential absent an express statement by the agency that it would not keep information private, or a clear implication to that effect." *Renewable Fuels Ass'n*, 519 F. Supp. 3d at 12.  That standard is plainly satisfied here, because Plaintiff has pointed to no evidence NHTSA made any such "express statement."

Regardless, even if an assurance of confidentiality were required, that assurance can certainly be express or implied.  *See Argus Leader*, 588 U.S. at 435 (citing approvingly circuit cases concluding Exemption 4 protected information revealed under an express or implied promise); *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Com.*, No. 18-CV-03022, 2020 WL 4732095, at *3 (D.D.C. Aug. 14, 2020).  That standard is satisfied here.  The SGO itself acknowledges that the requested categories can constitute "confidential business

13

information" exempt from disclosure under FOIA and provides instructions as to how to make a valid CBI claim. Compl. Ex. 1, Appendix B. The SGO forms also contain boxes by those categories allowing vehicle manufacturers to designate the information as "CBI." *See* Compl. Ex. 1 at 39; Compl. Ex. 2. And the SGO also offers no concrete description of circumstances under which such information *would* be disclosed. Tesla thus provided these categories of information to NHTSA with the reasonable understanding and expectation, based in part on the terms of the SGO, that this information will remain confidential. As described above, Tesla's practice is to submit a cover letter along with Incident Reports requesting confidential treatment for the submission. The cover letters explain that the Incident Reports contain information that is proprietary, confidential, and otherwise not publicly available. When Tesla submits the Incident Reports to NHTSA, it submits two versions: an unredacted version for use by NHTSA, and a redacted version that can be released in response to valid FOIA requests. Statement ¶ 19. And NHTSA has routinely granted Tesla's requests for confidentiality and shielded this information from disclosure.[5] Statement ¶ 41. Thus, although the Supreme Court has not resolved whether such assurances are necessary for maintaining confidentiality, assurances were in fact provided here.

## II. It is Reasonably Foreseeable That Disclosure Of The Requested Information Would Harm Tesla

It is reasonably foreseeable that disclosure of ADAS hardware and software, ODD condition, and incident narratives would harm Tesla's confidentiality interests, as well as its business and competitive interest. *E.g.*, Statement ¶ 34; Ex. 1, Gates Decl. ¶¶ 23, 27, 32. The Supreme Court in *Argus Leader* confirmed that competitive harm is not required under the text

---

[5] NHTSA has denied confidential treatment for certain narrow topics within the narrative (such as the sources of the incident information and information on available data).

of Exemption 4 to shield disclosure.  Under the FOIA Improvement Act of 2016, however, a

federal agency "shall withhold information" under FOIA if "the agency reasonably foresees that

disclosure would harm an interest protected by an exemption,'" in this case, Exemption 4.  5

U.S.C. § 552(a)(8).  Under any articulation of the new harm standard, Tesla and the agency

satisfy this prong.

Since *Argus Leader*, courts have taken different approaches to reconciling *Argus Leader*

and the foreseeable harm standard.  Under one approach, courts have held that the FOIA

Improvement Act did not effectively overturn *Argus Leader* by reimposing a competitive harm

standard under Exemption 4.  Under this approach, the "interest protected by" Exemption 4 is an

interest in keeping information private, full stop.  Thus, as one court has explained, "under

[*Argus Leader*], the plain and ordinary meaning of Exemption 4 indicates that the relevant

protected interest is that of the information's *confidentiality*—that is, its private nature.

Disclosure would necessarily destroy the private nature of the information, no matter the

circumstance." *Am. Small Bus. League v. U.S. Dep't of Def.*, 411 F. Supp. 3d 824, 836 (N.D.

Cal. 2019).  Here, disclosure would harm Tesla's confidentiality interest and need to protect its

proprietary information, which therefore requires NHTSA to withhold the information.  In

Tesla's view, this is the correct approach because the text of Exemption 4 and *Argus Leader*

makes clear that the interest underlying the Exemption is an interest in confidentiality, *not* just

preventing competitive harm.

Other courts, however, have held that the FOIA Improvement Act, as applied to

Exemption 4, requires a "showing of foreseeable commercial or financial harm to the submitter

upon release of the contested information." *Shteynlyuger v. Ctrs. for Medicare & Medicaid

Servs.*, 698 F. Supp. 3d 82, 124 (D.D.C. 2023) (internal quotation marks omitted).  As Plaintiff

15

implicitly concedes, this commercial or financial harm standard is not as demanding as the competitive harm standard that was rejected in *Argus*. Opp'n to Mot. to Intervene at 4, Dkt. No. 11. And as the text of the statute makes clear, the proper inquiry is not whether the harm will occur; but whether the agency has predicted that it is *reasonably foreseeable* that it will. *Cf. Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C. Cir. 2009) (opining that "[t]he 'arbitrary and capricious' standard is particularly deferential in matters implicating predictive judgments and interim regulations"). Tesla has made the showing of commercial, financial, and competitive harm that would result upon release of the requested information.

As Tesla's declaration establishes, public release of ADAS hardware and software versions will allow competitors to assess their efficacy and calculate the number of reportable incidents per system, which in turn will allow it to determine Tesla's rate of progress, among other commercially sensitive matters. Ex. 1, Gates Decl. ¶¶ 29, 33. The disclosure of such information—which can be preliminary—would subject Tesla to "harassment" or "cost [it] business." *Citizens for Resp. & Ethics in Washington v. U.S. Dep't of Just.*, 728 F. Supp. 3d 113, 125, 126 (D.D.C. 2024) (holding foreseeable harm standard satisfied for records related to procurement of lethal where "government has explained that identified companies are 'commonly subject to harassment, threats, and negative publicity leading to commercial decline[]'"). Disclosure of the narratives, which refer to ODD, will also result in commercial, financial, and competitive harm. Narrative responses generally identify the specific ADAS that was engaged prior to the incident and describe the events leading up to and including the incident, such as speed, location and direction, road conditions, and so forth. Statement ¶ 25. The narratives also describe the driver's behavior, such as whether the driver cancelled the ADAS, pushed the accelerator or brakes, jerked the wheel; identify the existence of incident-

16

related signals and alerts; and identify the sources of information about the incident available to Tesla (e.g., Event Data Recorder, telematics, vehicle logs). Here, too, public release of this information would result in public "harass[ment]" of Tesla, *Citizens for Resp. & Ethics*, 728 F. Supp. 3d at 125, and enable competitors to improve their own processes, both of which would cause Tesla commercial or financial harm. The harm is compounded by the aggregate disclosure of all the narratives, which would allow competitors to, among other things: deduce how Tesla identifies and examines reportable incidents; gain insights into how Tesla learns and evolves through data collection; track the pace of improvement in ADAS features over time; draw conclusions as to the effectiveness of one ADAS version over another; provide insights into how Tesla's software and vehicle technology works; and ascertain the strength and weaknesses of Tesla's features and use that knowledge to build or improve their own features and systems.

Moreover, the public disclosures implicate private customer information and Tesla's business relationships with its consumers. As Plaintiff's own complaint indicates, incidents involving Teslas are widely publicized. *See, e.g.*, Compl. ¶ 18 & n.2. The publicized information, taken together with the confidential information in the Incident Reports, may implicate individual drivers. Customers would be less likely to allow information sharing with Tesla, which would in turn impede Tesla's ability to investigate crashes and assess improvements. Statement ¶ 26.

In short, whether each category of information is assessed individually or together with the other categories (or the broader context of the Reports), disclosure would provide Tesla's competitors a wealth of information that could be used to assess or improve their own processes or to disparage Tesla and cause it commercial and financial harm. Statement ¶¶ 23, 38; *cf. Reporters Comm. for Freedom of the Press v. FBI*, 548 F. Supp. 3d 185, 199 (D.D.C. 2021)

17

(recognizing in the context of Exemption 7(E) that "'bits and pieces of data may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself'") (citation omitted).  Put simply, "in the hands of [Tesla's] competitors or the public," the requested information "could foreseeably cause financial and competitive harm.  *Org. for Competitive Markets v. Off. of Inspector Gen., USDA*, No. 14-CV-1902, 2024 WL 4753818, at *7 (D.D.C. Nov. 12, 2024).  Indeed, even under the pre-*Argus Leader* standard for competitive harm, courts acknowledged the harm inherent in the disclosure of information where "[n]ew companies … would be able to enter the market without the startup costs associated with researching successful importation means and practices."  *PETA v. HHS*, 901 F.3d 343, 354 (2018).  "Disclosing [such] information would provide competitors with something of a free roadmap to the industry—a 'potential windfall' that 'could easily have competitive consequences.'"  *Id.*  And, as relevant here, where Plaintiff seeks several categories of information, "the likelihood of substantial competitive injury can increase disproportionately as more information is released.  Requiring disclosure of multiple types of information provides a more comprehensive picture" of patterns and proprietary information.  *Id.*

## CONCLUSION

For the foregoing reasons, Tesla and NHTSA's Motions for Summary Judgment should be granted, and Plaintiff's Motion for Summary Judgment should be denied.  In the alternative, should the Court require additional information, Tesla requests that it and NHTSA be permitted to submit supplemental briefing.  *See, e.g.*, *Jud. Watch, Inc. v. U.S. Dep't of Just.*, No. 19-CV-800, 2020 WL 5798442, at *4 (D.D.C. Sept. 29, 2020); *Occupational Safety & Health L. Project, PLLC v. U.S. Dep't of Lab.*, No. 21-CV-2028, 2022 WL 3444935, at *12 (D.D.C. Aug. 17, 2022).

18

Dated:  April 2, 2025

TESLA, INC.

J. Taylor McConkie
(*pro hac vice*)
DC Bar No. 90004326
tmcconkie@tesla.com
800 Connecticut Ave., N.W.
Washington, D.C., 20005
Tele: (303) 386-6998

Allison Huebert
(*pro hac vice*)
ahuebert@tesla.com
1 Tesla Road
Austin, TX 78725
Tele: (512) 557-8797

Paul Margulies
pmargulies@tesla.com
DC Bar No. 1000297
800 Connecticut Ave., N.W.
Washington, D.C., 20005
Tele: (202) 695-5388


*Counsel for Intervenor-Defendant Tesla, Inc.*

19