## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WP COMPANY LLC
d/b/a THE WASHINGTON POST,

                Plaintiff,

      v.

NATIONAL HIGHWAY TRAFFIC
SAFETY ADMINISTRATION,

                Defendant,

TESLA, INC.,

                Intervenor-Defendant.

Case No. 24-cv-1353-TSC

Hearing Requested

## REPLY MEMORANDUM IN FURTHER SUPPORT OF
## PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

In opposing the *Post*'s motion for summary judgment, Tesla and NHTSA confirm that
the information the *Post* seeks is non-confidential and public.  Because neither Exemption 4 nor
Exemption 6 permits NHTSA to withhold that information, the Court should order its release.

As the *Post* detailed in its opening brief, NHTSA requires automobile manufacturers to
report information about crashes involving driver-assistance systems to evaluate whether those
manufacturers are "meeting their statutory obligations," to "identify crashes warranting further
follow-up," and to gather "information regarding potential defects" in the systems.  *See* 2d Am.
Standing General Order 2021-01 at 4-5 (ECF 1-1).  Tesla intervened in this case to prevent
access to this public information, offering generic and contradictory arguments for withholding
extensive information about crashes involving its vehicles.  Indeed, Tesla argues for redacting
information that Tesla itself freely discloses and that NHTSA requires manufacturers to make
public.  This objection to transparency is no surprise, as Tesla opposed the government's

1

collection of this information in the first place.  *See* Jarrett Renshaw et al., *Exclusive: Trump Team Wants to Scrap Car-Crash Reporting Rule that Tesla Opposes*, Reuters (Dec. 17, 2024), https://www.reuters.com/business/autos-transportation/trump-transition-recommends-scrapping-car-crash-reporting-requirement-opposed-by-2024-12-13.  Accepting Tesla's argument would allow NHTSA to withhold *any* information submitted by Tesla, an outcome that flies in the face of FOIA's requirements.  NHTSA then further defies logic by asserting FOIA's *privacy* exemption to withhold the locations of crashes on *public* roadways.

Access to the information that NHTSA collects about these crashes – including (1) the hardware and software versions in use, (2) whether the vehicle was within its operation design domain (ODD) at the time of the incident, and (3) the narrative of the crash – would enable the public to monitor and assess whether NHTSA is fulfilling its statutory obligation to ensure vehicle safety.  The Court should deny NHTSA's and Tesla's motions for summary judgment, grant the *Post*'s cross-motion, and ensure that the public can know whether NHTSA's regulation of driver-assistance systems is making roads safer or paving the way for disaster.

## I.    EXEMPTION 4 DOES NOT JUSTIFY NHTSA'S WITHHOLDINGS

### A.    Exemption 4 Does Not Justify Withholding Crash Information From Manufacturers Other Than Tesla.

As an initial matter, NHTSA has made *no* attempt to demonstrate, for its Exemption 4 withholdings of information from manufacturers other than Tesla, that those other manufacturers customarily and actually keep that information private or that its release would result in foreseeable harm.  *See* Mem. in Supp. of Post's Cross-Mot. for Summ. J. ("*Post* Mem.") (ECF 27) at 13.  NHTSA instead relies on blanket statements that it "properly assessed the reporting entities' requests" and "made the same determination" on requests from Tesla as it did for other manufacturers.  *See* NHTSA Reply and Cross-Opp. ("NHTSA Opp.") (ECF 31) at 2, 5; *see also*

2

*id.* at 4, 6.  That does not suffice.  *See Ctr. for Biological Diversity v. U.S. Forest Serv.*, 2025 WL 947472, at *9 (D.D.C. Mar. 28, 2025) (agencies cannot rely on "speculation" and "out-of-court statements by private third parties"); *Pub. Citizen v. Dep't of Agric.*, 2022 WL 3139003, at *4 (D.D.C. Aug. 5, 2022) (under Exemption 4, "it was imperative that USDA come forward with admissible statements from the companies themselves").  The Court should therefore order NHTSA to release the information submitted by these manufacturers immediately.

    **B.**    **Exemption 4 Does Not Justify Withholding Crash Information From Tesla.**

The information submitted by Tesla, which redacts far more than other manufacturers, must also be released.  Tesla strains to stretch FOIA's exemption for "confidential commercial information" to encompass information that Tesla freely shares with its own customers and that NHTSA requires to be public, arguing in error that the information is somehow "secret" merely because it has been "compiled."  Moreover, even if the information qualified as "confidential" (and it does not), Tesla's vague articulations of competitive "harm" and "disparagement" are insufficient to carry its burden under FOIA.

    **1.**    **Tesla does not treat the requested information as confidential.**

Exemption 4 does not apply unless the information is "customarily and actually treated as private by its owner."  *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 440 (2019).  Tesla's "version" information easily fails this threshold test, because it "is hard to see how information could be deemed confidential if its owner shares it freely."  *Id.* at 434.  Tesla does not dispute that it shares version information with anyone who steps inside its vehicles, with *no* limits on what those individuals do with that information.  *See Post* Mem. at 14.  Tesla cannot now claim that information is "closely held."  *Food Mktg. Inst.*, 588 U.S. at 440.

3

NHTSA instead asserts that "linking the version to a vehicle accident" is "different from the information that any individual driver might be able to access from within their vehicle." NHTSA Opp. at 3. But drivers are in the *best* position to link information about their vehicles to details regarding their involvement in accidents, and Tesla itself claims that it relies on gathering certain information included in its incident reports *from drivers*. *See* Tesla Reply and Cross-Opp. ("Tesla Opp.") (ECF 29) at 20 n.4. Version information is simply not confidential.

Tesla's ODD information also cannot qualify as "confidential" under Exemption 4, as Tesla has openly revealed that information in this lawsuit. Tesla admitted that "the ODD for a Tesla vehicle is essentially any roadway in America in which the driver is comfortable." Tesla Mem. in Support of Mot. for Summ. J. ("Tesla Mem.") (ECF 25-1) at 5; *see also* Tesla Opp. at 10 (reiterating that Tesla vehicles "are not restricted to certain operating conditions"). Tesla seeks to contain the damage of its admission, claiming that the Standing Order's question is "ill-suited to Tesla's ADAS" and the responses "would make little sense." Tesla Opp. at 10. Even assuming that is true, it is irrelevant to whether the information is *confidential*, which is a necessary condition for the information to fall under Exemption 4.

For its part, NHTSA claims that the ODD information "also includes the presence or absence of certain traffic or roadway characteristics and design considerations that are customarily kept private." NHTSA Opp. at 5. But the only possible answers Tesla could offer to the "Within ODD?" question are (1) "Yes," (2) "No, see Narrative," or (3) "Unknown, see Narrative." *See Standing General Order 2021-01 Incident Report: Data Dictionary* at 34, https://static.nhtsa.gov/odi/ffdd/sgo-2021-01/SGO-2021-01_Data_Element_Definitions.pdf. Given Tesla's admission, the answer should always be "yes." But even if the answer directs

NHTSA to the corresponding narrative, Defendants have not explained why the bare fact that

Tesla referred to the narrative could possibly qualify as confidential.

Finally, Defendants do not dispute that the narratives contain public information that,

individually, Tesla does not "customarily and actually" treat as private.  Nor could they.  *See*

*Post* Mem. at 15.  Tesla claims that the public "would need to mine local news reports or

interview local officials" to learn the information in its narratives, but much of the information

Tesla admits it includes in its narratives—*e.g.*, "road conditions" and "sources of information"

about an accident, *see* Gates Decl. ¶ 31 (ECF 25-4)—is *required* to be public under the Standing

Order, *see Level 2 ADAS Incident Report Data*.  To the extent the information is not reflected in

the columns publicly disclosed in the spreadsheet, that is only because Tesla used those columns

to refer to the narratives, where it then hid the information.  *See Post* Mem. at 16.  Tesla's claim

that it was "provided assurances" that the information would be considered confidential thus falls

flat.  *See* Tesla Opp. at 14.  To the contrary, NHTSA explicitly stated that this information would

*not* be kept confidential, and there is *no* confidentiality in information the government warns will

be made public.  *See WP Co. LLC v. SBA*, 502 F. Supp. 3d 1, 17 (D.D.C. 2020) (information not

confidential where "the Government not only provided no assurance of privacy, but also told

borrowers explicitly that the information would be disclosed."); *Humane Soc'y of v. Dep't of*

*Agric.*, 549 F. Supp. 3d 76, 90-91 (D.D.C. 2021) (information not confidential where entities

were "put on notice that the information . . . could be shared with nongovernmental entities").

To justify these overbroad redactions, Defendants primarily claim that the information—

while not "secret"—becomes confidential when it is compiled in incident reports.  *See* Tesla

Opp. at 7 ("the proper inquiry is focused on whether the relevant information in the requested

record—Tesla's aggregated safety related data—are non-public and customarily treated as

confidential"); NHTSA Opp. at 3, 6 (claiming the "specific" information requested is confidential). Under this logic-defying theory, narratives made up *entirely of public information* are "confidential" because they are "unique compilations of facts and data" that have not been "disclosed publicly to anybody." Tesla Opp. at 10-11. In support of this argument, Tesla cites decades-old case law with no relation to the test that the Supreme Court articulated in *Food Marketing Institute*. *See* Tesla Opp. at 6. Under Tesla's test, information is confidential unless (1) "the exact information Plaintiff seeks is available elsewhere in a permanent public record" and (2) "such information is freely or cheaply available from other sources." Tesla Opp. at 6.

For its first element, Tesla cites *Davis v. Department of Justice*, which involved a FOIA request for recordings played in open court. 968 F.2d 1276, 1278 (D.C. Cir. 1992). The court explained "that the government cannot rely on an otherwise valid exemption claim to justify withholding information that has been 'officially acknowledged' or is in the 'public domain.'" *Id.* at 1279. But the "official acknowledgment" doctrine is entirely separate from the question of whether *Tesla* "customarily and actually" treats the information at issue as private, which is a threshold requirement for Exemption 4. *See* Mem. at 12-16. Defendants' focus in the Opposition is therefore misplaced, and they have not carried their burden on that threshold issue. *See* Tesla Opp. at 11-13; NHTSA Opp. at 3, 6-7. Under Exemption 4, a company cannot claim protection over information that it freely discloses or has no ability to claim is "confidential." *See Humane Soc'y*, 549 F. Supp. 3d at 88 (requiring release of information that company disclosed on its public website); *Naumes v. Dep't of the Army*, 588 F. Supp. 3d 23, 39 (D.D.C. 2022) (requiring release of requested information "from any sources available publicly").

For its second element, Tesla points to *Worthington Compressors, Inc. v. Costle*, which was decided under the now-overruled "substantial competitive harm" test. 662 F.2d 45, 51 (D.C.

Cir. 1981).  Under that test, the court would deem a company's noise-testing reports confidential, even if they could be reverse-engineered, so long as their release would cause substantial competitive harm.  The information's "commercial value to competitors and the cost of acquiring it through other means" was therefore relevant.  *Id.* at 52.  Those considerations, however, have little do with whether a company "customarily and actually" keeps information private—the test this Court must apply under *Food Marketing Institute*.

Defendants find little case law to support their "compilation" theory.  Instead, Tesla points to a trade secret case, *see* Tesla Opp. at 3, which actually highlights the theory's flaws because a "combination of known elements" is a trade secret only if that combination is not "obvious."  *Catalyst & Chem. Servs., Inc. v. Glob. Ground Support*, 350 F. Supp. 2d 1, 10 (D.D.C. 2004) (citing *Strategic Directions Grp., Inc. v. Bristol-Myers Squibb Co.*, 293 F.3d 1062, 1065 (8th Cir. 2002)), *aff'd*, 173 F. App'x 825 (Fed. Cir. 2006).  Here, the combination of the information *is* obvious.  The government explicitly *requires* companies to submit certain information.  The information does not somehow become "confidential" or "secret" merely because Tesla was required to combine it when submitting crash reports to the government.

Tesla also points to *Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749 (1989), an Exemption 7 case concerning FBI-compiled rap sheets.  There, the Supreme Court considered whether individuals' "personal privacy" interest in government "compilations" of information about them outweighed the public interest in disclosure.  *Id.* at 780.  That case did not involve a corporation's commercial interest in confidentiality, and unlike the "rap sheet" in question there, which the Court held would not "tell us anything about the conduct" of the government, *id.* at 774, the spreadsheet at issue here contains reports of public incidents involving primarily non-confidential information that the government requires

manufacturers to submit to ensure vehicle safety. These crash reports are therefore different in kind from rap sheets, as they shed direct light on "what the Government is up to." *Id.* at 780.[1]

Because Defendants do not explain how the version information, ODD responses, or specific information contained in the narratives are confidential, even under the unsupported "compilation" theory, all of that information should be released. At minimum, Defendants should be required to release the information that is undisputedly neither "private" nor "secret." *Food Mktg. Inst.*, 588 U.S. at 434.[2]

### 2. Defendants have not satisfied the foreseeable harm standard.

Because the crash information that NHTSA has withheld under Exemption 4 is not confidential in the first place, there is no need to evaluate the potential harm, if any, from its release. But as a separate and additional ground for disclosure, Defendants fail to demonstrate that it is reasonably foreseeable "that disclosure would harm an interest protected" by Exemption 4. *Ctr. for Investigative Reporting v. CBP*, 436 F. Supp. 3d 90, 100, 105-06 (D.D.C. 2019) (quoting 5 U.S.C. § 552(a)(8)(A)).

Defendants do not meaningfully dispute that the harm from disclosure must be to Tesla's "economic or business" interests to satisfy this standard. *See Post* Mem. at 16-17. Defendants instead aim to minimize their burden, claiming they need only show a "likelihood of substantial competitive injury." Tesla Opp. at 17; NHTSA Opp. at 7. In this regard they misunderstand the

---

[1] Tesla also claims that version information is "analogous to segments of a customer or inventory list." Tesla Opp. at 7. In those situations, the *customer* is sharing the information with the *company*. Here, Tesla is claiming confidentiality over its own information that it freely shares with the public and is required to disclose by law. It is thus unlike cases where an entity "never publicly disclosed" the information. *Org. for Competitive Markets v. Office of Inspector Gen., USDA*, 2024 WL 4753818, at *6 (D.D.C. Nov. 12, 2024) (cited in NHTSA Opp. at 8).

[2] Tesla errs in claiming that the *Post* "forfeited" any argument regarding segregability, *see* Tesla Opp. at 7, as the *Post* clearly objected to "blanket redactions" and "redacting . . . columns entirely" when information within those columns is "require[d] to be public," *Post* Mem. at 16.

"heightened" foreseeability requirement, which does not allow agencies to speculate about harm. *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 100, 105-06. Defendants "must *concretely* explain how disclosure 'would'—not 'could'—cause harm." *Wilson v. FCC*, 2022 WL 4245485, at *13 (D.D.C. Sept. 15, 2022) (emphasis added) (quoting *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369-70 (D.C. Cir. 2021)) (cleaned up).

Defendants fail to carry this burden. Tesla does not tie its purported harms to the specific disclosure of even one of the thousands of redacted narratives. Nor does it explain how knowing the pieces of information it claims those narratives generally contain—*e.g.*, a driver's behavior before a crash—would grant competitors an advantage. As for version information, Tesla claims that it would allow competitors to "draw conclusions as to Tesla's rate of progress." Tesla. Opp. at 16. When pressed on the validity of that concern, however, Tesla stated that rates could be calculated by considering, *inter alia*, "whether the driver had downloaded the most recent software update." *Id*. at 18. Tesla does not explain—nor could it—how such facts about *driver* behavior could be used to determine *Tesla's* rate of progress.

Indeed, the cases that Tesla cites demonstrate the insufficiency of its arguments. *See id*. at 19-20. Those cases do not hold that general "insights" into a company's evolution or its "rate of progress" would amount to competitive harm. They instead involve disclosures that are roadmaps, which would allow competitors to "disrupt, compete with, or copy" another company's program or business model. *E.g.*, *PETA v. HHS*, 901 F.3d 343, 354 (D.C. Cir. 2018) (information that would reveal "which importers have relationships with which airline carriers, and which airline carriers are willing to transport which species of nonhuman primate along which routes and from which countries"); *100Reporters LLC v. DOJ*, 248 F. Supp. 3d 115, 140 (D.D.C. 2017) (compliance and training materials that "would provide [competitors] with a 'free

roadmap' as to how they might efficiently comply with the laws and regulations in the highly-regulated spaces in which Siemens operates"); *Pub. Citizen v. HHS*, 66 F. Supp. 3d 196, 208 (D.D.C. 2014) (information that would allow competitors to "learn how Pfizer promotes its products through its marketing programs, and its related compliance controls around these programs," and "copy Pfizer's approach" (cleaned up)). Tesla does not identify even a single piece of information that competitors could use to copy Tesla or to improve their own processes.

Tesla further errs in arguing that competitors may use the withheld information to "draw speculative conclusions" about Tesla and "unfairly disparage" it. Tesla Opp. at 22. Defendants cannot "convert[] 'public scrutiny' into a potential basis for withholding information," even when disclosure would have "potential knock-on commercial effects." *CREW v. DOJ*, 58 F.4th 1255, 1267 (D.C. Cir. 2023). "That is not what Congress had in mind when it protected citizens' right to be informed about 'what their government is up to.'" *Id.* at 1268.

Because Defendants have not shown that the information withheld under Exemption 4 is confidential and Defendants have not satisfied the foreseeable harm standard, the Court should order NHTSA to disclose this information immediately.

## II. EXEMPTION 6 DOES NOT JUSTIFY NHTSA'S WITHHOLDINGS

NHTSA also cannot and does not explain how FOIA's *privacy* exemption could possibly justify withholding the location of crashes that occurred on *public* roadways.

NHTSA first fails to demonstrate how disclosing crash locations would even harm personal privacy interests. NHTSA claims that the crash location information would "enable the public to identify individuals involved in the crashes," *see* NHTSA Opp. at 9, but the declaration that NHTSA relies on for this proposition merely posits that identification *could* be accomplished with "few additional steps," such as an "internet search," *see* Humphrey Decl. ¶ 13 (ECF 26-4). This is the same degree of speculation that courts have held insufficient to claim a

risk of privacy harms from disclosure.  *See Ayuda, Inc. v. FTC*, 70 F. Supp. 3d 247, 271 (D.D.C. 2014); *ACLU v. Fed. Bureau of Prisons*, 2022 WL 17250300, at *12 (D.D.C. Nov. 28, 2022).

Indeed, NHTSA piles one conjecture atop another, first hypothesizing that location information could identify individuals in a crash and then assuming that those individuals would have a cognizable privacy interest in being connected to a crash on a public road.  NHTSA Opp. at 8.  Case law is clear that individuals have little, if any, privacy interest in what happens on public roads, and NHTSA offers scant authority demonstrating otherwise.  *See Post* Mem. at 21-22; *see also* NHTSA Opp. at 8 (conceding that "public access may reduce the privacy interest").

Even if NHTSA's privacy concerns were more than speculative (and they are not), they would not outweigh the powerful public interest in disclosure.  NHTSA does not deny that the information would help the public understand NHTSA's role in vehicle safety.  Rather, NHTSA claims that it has "robust enforcement authorities that enable the agency to investigate deficiencies in reporting" that are "sufficient mechanisms for enforcing reporting compliance." NHTSA Opp. at 11.  NHTSA thus argues that the public should trust it to monitor itself.

FOIA, however, stands for the opposite proposition.  *See, e.g.*, *Reporters Comm.*, 489 U.S. at 773 (FOIA ensures the public knows "what their government is up to").  "Official information that sheds light on an agency's performance of its statutory duties falls squarely within [FOIA's] statutory purpose."  *Id.*  The public is therefore empowered to double check the work the government is doing on its behalf.  *See NPR, Inc. v. FEMA*, 2017 WL 5633090, at *9 (D.D.C. Nov. 21, 2017) (public interest is served when records "will enable the public to more easily monitor whether [the agency is] carrying out [its] statutory duty").

Recent press reports highlight the importance of public access to the information at issue here.  Earlier this month, Bloomberg reported on a fatal crash in Arizona—in which a driverless

Tesla automobile driving toward the sunset struck a pedestrian—that prompted "an ongoing

federal investigation into whether Full Self-Driving poses an unacceptable safety risk." Dana

Hull & Craig Trudell, *A Fatal Tesla Crash Shows the Limits of Full Self-Driving*, Bloomberg

(June 4, 2025), https://www.bloomberg.com/features/2025-tesla-full-self-driving-crash. Through

a public records request, Bloomberg was able to obtain video of that crash, which showed a

Tesla vehicle going "around a curve that turned directly into the glaring sunlight." *Id.* The

article described four other incidents within months of that crash that "occurred in conditions that

reduced roadway visibility, such as sun glare, fog or airborne dust." *Id.* Here is how the Arizona

police report describes the crash location and conditions:

> **INVESTIGATION:**
>
> **ENVIRONMENTAL AND ROAD FACTORS:**
>
> INTERSTATE 17 WAS A NORTHBOUND AND SOUTHBOUND CONTROLLED ACCESS FREEWAY AND PART OF THE UNITED STATES INTERSTATE SYSTEM. INTERSTATE 17 AT MILE POST 292.9 CONSISTED OF TWO NORTHBOUND TRAVEL LANES AND TWO SOUTHBOUND TRAVEL LANES SEPARATED BY A MEDIAN OF NATURAL TERRAIN. THE TRAVEL LANES IN EACH DIRECTION WERE DIVIDED BY A BROKEN WHITE LINE WITH DEPRESSED, SUBTERRANEAN REFLECTORS IN THE ROADWAY. THE TRAVEL LANES WERE BORDERED TO THE RIGHT BY A SOLID WHITE LINE, A RUMBLE STRIP, AN EMERGENCY SHOULDER, AND NATURAL TERRAIN. THERE WERE EARTHEN EMBANKMENTS PRESENT ON THE EAST (MEDIAN SIDE) AND WEST SIDE OF THE SOUTHBOUND LANES. THE TRAVEL LANES WERE BORDERED TO THE LEFT BY A SOLID YELLOW LINE, AND MEDIAN CONSISTING OF NATURAL TERRAIN. THE SOUTHBOUND ROADWAY HAD AN UPHILL GRADE IN THE AREA, AND WAS STRAIGHT.
>
> INTERSTATE 17 WAS CONSTRUCTED OF RUBBERIZED ASPHALT. THE POSTED SPEED LIMIT ON INTERSTATE 17 WAS 75 MILES PER HOUR.
>
> THE WEATHER AT THE TIME OF THE CRASH, AS REPORTED BY THE NATIONAL WEATHER SERVICE AND MEASURED AT SEDONA AIRPORT APPROXIMATELY 14.7 MILES NORTHEAST OF THE CRASH SCENE, WAS 44 DEGREES FAHRENHEIT WITH WINDS COMING FROM THE NORTH-NORTHWEST AT 15 MILES PER HOUR. SKIES WERE CLEAR AND VISIBILITY WAS AT 10 MILES. AT THE TIME OF THE COLLISION THE SUN WAS SETTING DIRECTLY IN THE LINE OF SIGHT OF SOUTHBOUND TRAFFIC.

*See id.*[3] The corresponding NHTSA crash reports are paltry by comparison. For the initial "1-

day" report – submitted *seven months* after the crash – the "Roadway Type," "Roadway

---

[3] The police report, which is hyperlinked in the Bloomberg report, is available at https://assets.bwbx.io/documents/users/iqjWHBFdfxIU/rdX.0ijmrFcI/v0.

Surface," "Roadway Description," "Posted Speed Limit," "Lighting," and "Weather" are all

listed as unknown. *See* Level 2 ADAS Incident Report Data at row 1148.[4]  Indeed, even in the

supplemental "10-day update" report, the same categories of information are far from fulsome:

- "Roadway Type" is reported as "Highway / Freeway";

- "Roadway Surface" is reported as "Dry";

- "Roadway Description" is reported as "Traffic Incident";

- "Posted Speed Limit" is still reported as "unknown"; and

- "Lighting" is reported as "Dawn / Dusk."

*See id.* at row 1130.  If the actual location of the crash were disclosed, the press and public could

obtain far more information about the road conditions at the time of the crash, which would help

the public to better understand roadway conditions during accidents, better assess whether

NHTSA is adequately responding to those accidents, and better evaluate whether NHTSA is

satisfying its statutory duty to "protect[] the public against unreasonable risk of accidents

occurring because of the design, construction, or performance of a motor vehicle."  49 U.S.C.

§ 30102(9); *see also Post* Mem. at 24-25.

Because NHTSA's less than "'tepid showing' of a privacy interest does not outweigh the

strong public interest in monitoring" its "statutory compliance and use of public funds," *Humane*

*Soc'y*, 549 F. Supp. 3d at 94, its withholding of crash location information under Exemption 6 is

improper and the Court should order NHTSA to disclose that information immediately.

## CONCLUSION

For the foregoing reasons, and those set forth in its initial brief, the *Post* respectfully

requests that the Court grant its Cross-Motion for Summary Judgment, deny NHTSA's and

---

[4] Available at https://www.nhtsa.gov/laws-regulations/standing-general-order-crash-reporting.
For ease of reference, the "Same Incident ID" assigned to this crash is 3992b4e2e6ccdd3.

Tesla's Motions for Summary Judgment, direct NHTSA to promptly release all responsive

records, and order that the *Post* be awarded the attorney's fees and costs it has reasonably

incurred in litigating this matter.

Dated:  June 17, 2025                 Respectfully submitted,

                                      BALLARD SPAHR LLP

                                      /s/ *Charles D. Tobin*
                                      Charles D. Tobin (#455593)
                                      Maxwell S. Mishkin (#1031356)
                                      1909 K Street NW, 12th Floor
                                      Washington, DC 20006
                                      Tel: (202) 661-2200
                                      Fax: (202) 661-2299
                                      tobinc@ballardspahr.com
                                      mishkinm@ballardspahr.com

                                      *Counsel for Plaintiff WP Company LLC*
                                      *d/b/a The Washington Post*