**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **WP COMPANY LLC,**<br>**d/b/a THE WASHINGTON POST,**<br><br>Plaintiff,<br><br>v.<br><br>**NATIONAL HIGHWAY TRAFFIC**<br>**SAFETY ADMINISTRATION,** *et al.*,<br><br>Defendants. | Civil Action No. 24-cv-1353 (TSC) |

<u>**MEMORANDUM OPINION**</u>

Plaintiff WP Company LLC d/b/a *The Washington Post* (the "Post") filed this suit against Defendant National Highway Traffic Safety Administration ("NHTSA") on May 9, 2024, seeking to compel the disclosure of certain records related to the safety of motor vehicles equipped with advanced driver assistance systems that the Post previously requested under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. After the court permitted Tesla, Inc. ("Tesla") to intervene as a Defendant, *see* Op. and Ord., ECF No. 19, Tesla and NHTSA separately moved for summary judgment. *See* Tesla Mem. in Supp. of Mot. for Summ. J. ("Tesla Mot."), ECF No. 25-1; NHTSA Mem. in Supp. of Mot. for Summ. J. ("NHTSA Mot."), ECF No. 26-1. The Post opposed both motions and filed a cross-motion for summary judgment. Post Mem. in Supp. of Cross-Mot. for Summ. J. ("Post Mot."), ECF No. 27-1. For the reasons below, the court will GRANT in part and DENY in part Defendants' Motions for Summary Judgment and DENY Plaintiff's Cross-Motion for Summary Judgment without prejudice.

I.    BACKGROUND

Under the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. §§ 30101, *et seq.*, NHTSA is responsible for "reduc[ing] traffic accidents and deaths and injuries resulting from traffic accidents," *id.* § 30101.  Pursuant to this authority, NHTSA issued a Standing Order on April 5, 2023, requiring automobile manufacturers to report vehicle crashes that occur when certain autonomous technology is used at the time of a crash or shortly before.  *See* 2nd Am. Standing General Order 2021-01 ("Standing Order"), ECF No. 1-1.  NHTSA compiles these reports and periodically publishes a spreadsheet containing the aggregated data—with certain redactions—on its public website.  Decl. of Michael Kuppersmith ("Kuppersmith Decl.") ¶ 18, ECF No. 26-3.  According to the agency, "it is critical for NHTSA to exercise its robust oversight over potential safety defects in vehicles" with this technology, given their "rapid evolution" and the "testing of new technologies and features on publicly accessible roads."  Standing Order at 3.[1] The Standing Order further explains that the information will help the agency "evaluate whether specific manufacturers . . . are meeting their statutory obligations to ensure that their vehicles and equipment are free of defects that pose an unreasonable risk to motor vehicle safety or are recalled if such a safety defect is identified."  *Id.* at 5–6.

In light of these stated concerns, the Standing Order mandates that vehicle and equipment manufacturers and operators of vehicles equipped with Automated Driving Systems ("ADS") and Level 2 Advanced Driver Assistance Systems ("ADAS"), *id.* at 6, including Tesla, *see* Decl. of Eddie Gates ("Gates Decl.") ¶ 6, ECF No. 25-4, submit specific information relating to covered accidents, including*, inter alia*, the make, model, and year of the vehicle, the associated Vehicle Identification Number ("VIN"), the precise location of the crash, the pre-crash speed, whether

---

[1] Because the Standing Order is not paginated, the court refers to the ECF-generated page numbers.

airbags were deployed, whether injuries resulted, and whether property was damaged, *see* Sample Form, ECF No. 1-2; Gates Decl. ¶ 6. Manufacturers must also disclose the hardware and software versions of the automated driving technology with which the vehicle was equipped, whether the vehicle was within its operational design domain ("ODD") at the time of the crash,[2] and a narrative of the accident. Standing Order at 14–15. While NHTSA releases most of its incident report data publicly and, in fact, expressly disclaims any obligation to keep such information confidential, the Standing General Order permits reporting entities to file "narrowly tailored" and "appropriately supported" requests for confidential treatment of the information contained in these latter three categories. *Id.* The agency treats these categories separately for confidentiality purposes because it determined that the information reported in those fields "is more likely to reveal proprietary aspects of the system's design." Kuppersmith Decl. ¶ 15. Though confidential treatment of this information is not guaranteed, Standing Order at 14–15, the agency will redact the corresponding portions of its public spreadsheets when it grants a reporting entity's confidentiality request, *id.* at 36–37.

In accordance with these directions, Tesla files redacted and unredacted versions of its incident reports with a cover letter that designates the above three categories of information as "proprietary, confidential, and otherwise not publicly available" and states that public dissemination of such information "would cause competitive harm to Tesla, including by revealing how Tesla's software and vehicle technology work." Gates Decl. ¶¶ 21, 23. NHTSA routinely approves Tesla's requests, with some exceptions. *Id.* ¶ 24; Kuppersmith Decl. ¶ 21 (listing instances where the agency denied Tesla's confidentiality requests). According to the Post, other

---

[2] ODD refers to the conditions—"including environmental, geographical, traffic, roadway characteristics, and so forth"—within which the vehicle is designed to safely operate. Gates Decl. ¶ 18 n.1.

manufacturers, such as Honda, Subaru, and BMW, only partially redact these categories in some entries.  Compl. ¶ 35, ECF No. 1.

In May 2023, the Post submitted a FOIA request to NHTSA seeking the Agency's "Level 2 ADAS incident report data spreadsheet in unredacted format, including the unredacted 'ADAS/ADS Version', 'Within ODD?', and 'Narrative' columns."  Decl. of Shonda Humphrey ("Humphrey Decl.") ¶ 6, ECF No. 26-5; *see also* FOIA Request, ECF No. 1-3.  NHTSA issued a partial response in January 2024, providing the Post a link to the redacted spreadsheets but withholding the redacted versions under FOIA Exemption 4, *see* 5 U.S.C. § 552(b)(4), "because [the requested fields] contain[ed] information related to trade secrets and commercial or financial information" "for the reasons set forth in NHTSA's October 4, 2023 determination," NHTSA Partial Response, ECF No. 1-4.  The 2023 determination granted over 100 of Tesla's requests for confidential treatment of these fields.  Confidentiality Determination at 1–4, ECF No. 1-5.  As attachments to its partial response, NHTSA produced copies of Tesla's confidential treatment requests and the agency's confidentiality determination.  Compl. ¶ 37.  NHTSA also withheld information regarding*, inter alia*, the locations of reported crashes—latitude, longitude, address, and zip code—as well as the exact dates of the incidents and when the reporting entity received notice of the incident, under FOIA Exemption 6, 5 U.S.C. § 552(b)(6).  Humphrey Decl. ¶ 13.

Plaintiff appealed that response in March 2024 and, when NHTSA failed to render a decision, filed this case, alleging that NHTSA violated FOIA by not producing the disputed information in unredacted form.  *See* Compl. ¶¶ 39–56; FOIA Appeal Request, ECF No. 1-7.  NHTSA filed its Answer on June 7, 2024, ECF No. 5, and, despite producing additional responsive documents both prior to and during this litigation, has continued to withhold production of the above three categories of information under Exemption 4, as well as information regarding the

location of the reported crashes, including latitude, longitude, address, and zip code, under Exemption 6.  *See* Joint Status Report ¶¶ 2–5 (Jan. 9, 2025), ECF No. 22.  On December 12, 2024, the court granted Tesla's motion to intervene to defend NHTSA's withholding of its reported crash information under Exemption 4.  *See* Op. and Ord. at 1.  Thereafter, Tesla and NHTSA separately moved for summary judgment on April 2, 2025, *see* Tesla Mot.; NHTSA Mot.  The Post opposed both motions and cross-moved for summary judgment on May 2, 2025.  *See* Post Mot.

## II.    LEGAL STANDARD

Summary judgment is appropriate where, viewing the facts in the light most favorable to the non-moving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 247–48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is material if it "might affect the outcome of a suit under governing law" and an issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Holcomb*, 433 F.3d at 895 (quoting *Anderson*, 477 U.S. at 248).

In FOIA cases, summary judgment may only be granted where an agency demonstrates that no material facts are in dispute as to whether it conducted an adequate search for responsive records and whether each identified responsive record has been produced or is exempt from disclosure.  *See Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 59 F. Supp. 3d 184, 189 (D.D.C. 2014).  FOIA "expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'"  *U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).  "An agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'"  *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007) (citations omitted).

### III.    ANALYSIS

As indicated above, this case challenges the legality of the agency's withholding of certain categories of information contained on its Level 2 ADAS incident report data spreadsheet pursuant to Exemptions 4 and 6 of FOIA.  The court will therefore address the parties' arguments regarding each of the agency's claimed FOIA exemptions in turn, followed by a segregability analysis.

### A.  Exemption 4

NHTSA invokes Exemption 4 in withholding accident report data regarding entries for (1) the hardware and software version of the automated driving technology with which the vehicles were equipped, (2) whether the vehicles were within their ODD at the time of the crash, and (3) the narratives of the incidents.  *See* NHTSA Mot. at 9; *Vaughn* Index at 32–197, ECF No. 26-4. The Post argues that the information contained within those fields is not "confidential," as required under Exemption 4, and that Defendants "have not shown that any cognizable harm would foreseeably result" from their disclosure.  Post Mot. at 2, 11.  Defendants counter that the information was properly deemed confidential, and that harm would result from the disclosure of such information.  *See* NHTSA Mot. 8–14; Tesla Mot. 9–14.  For the reasons below, and particularly given the Supreme Court's decision in *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427 (2019), Defendants have met their burden for withholding Tesla's version and narrative information under Exemption 4, but not for information reported by other manufacturers or Tesla's ODD information.

### 1.  *Confidential*

Exemption 4 permits agencies to withhold "trade secrets and commercial or financial information obtained from a person[3] and privileged or confidential."  5 U.S.C. § 552(b)(4).  Under the standard established by the Supreme Court in *Argus Leader*, which rejected the prior "substantial competitive harm" test, information withheld pursuant to Exemption 4 need only be "customarily and actually treated as private by its owner" to qualify as "privileged or confidential." 588 U.S. at 440.  Courts look to whether the withheld information is the kind "that would customarily not be released to the public by the person from whom it was obtained," *Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992), as well as whether the specific information at issue is, in fact, treated as private by its owner, *Argus Leader*, 588 U.S. at 440.  Thus, to qualify for withholding under Exemption 4, such information may not be shared freely, customarily disclosed, or made publicly available.  *Argus Leader*, 588 U.S. at 434 (citations omitted).  The *Argus Leader* Court also indicated that information might "*lose* its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private," but did not go so far as to require such assurances of confidentiality.  *Id.* at 434–35; *see also Citizens for Resp. & Ethics in Washington* ("*CREW*") v. *U.S. Dep't of Just.*, 58 F.4th 1255, 1269 (D.C. Cir. 2023).

### a.  Customarily and Actually Treated as Private

#### i.  *Information Submitted by Reporting Entities Other Than Tesla*

There appears to be some discrepancy over whether the agency withheld the three categories of information at issue—version data, ODD information, and the narrative field—for reporting entities other than Tesla.  For instance, the Post challenges the agency's Exemption 4

---

[3] The Post does not dispute that the withheld information is commercial or financial, nor does it question whether the information was "obtained from a person."  *See generally* Post Mot. at 11–20.

withholdings regarding redacted information submitted by Tesla and other manufacturers, *see* Post Mot. at 13, and NHTSA's briefing suggests that it did, in fact, invoke Exemption 4 to withhold information contained in these categories submitted by other reporting entities, *see* NHTSA Mot. at 8 ("the Post has challenged the Agency's grant of Tesla's and other reporting entities' CBI requests . . . and the subsequent withholding of that information under Exemption 4."); *see also id.* at 4 n.5 ("Most of the reports in the spreadsheet referenced in the Request were submitted by Tesla . . . although other manufacturers' reports were included in the Agency's subsequent productions.").

The Post's FOIA request itself did not differentiate among manufacturers, but merely requested the Agency's "Level 2 ADAS incident report data spreadsheet in unredacted format." FOIA Request at 1; Humphrey Decl. ¶ 6. But the agency's *Vaughn* Index suggests that NHTSA only invoked Exemption 4 to withhold Tesla's information, whereas it appears that the agency withheld other entities' information, as well as Tesla's, pursuant to Exemption 6. *See Vaughn* Index at 1–197. Given this uncertainty, the court briefly addresses the agency's shortcomings with respect to information reported by entities other than Tesla and then proceeds to the parties' arguments regarding information submitted by Tesla.

In support of its Exemption 4 withholdings, NHTSA submits a declaration from Michael Kuppersmith, a NHTSA attorney, who states:

> Based on review of the requests for confidential treatment at issue and the associated information, the agency determined that . . . the reporting entities submitted the information to the agency under NHTSA's framework of statutory and regulatory provisions governing confidential information, which provides an assurance of privacy for confidential business information . . . and the reporting entities customarily and actually kept the information private.

Kuppersmith Decl. ¶ 20. Throughout its briefing, NHTSA also points to statements from Tesla's declarant regarding Tesla's actual and customary confidential treatment of version data, ODD

information, and narratives to suggest that other manufacturers treat these categories of information similarly. *See, e.g.*, NHTSA Mot. at 9 ("Tesla's filings in this case exemplify the extent to which reporting entities themselves consider the information at issue to be [confidential business information]."). According to the Post, this information fails to carry the agency's burden because it lacks the requisite level of specificity required to justify withholding under Exemption 4. *See* Post Mot. at 13. The court agrees.

Although an agency may rely solely on its sworn affidavits that are based on personal knowledge, *Ctr. for Inquiry, Inc. v. Dep't of Health & Hum. Servs.*, 723 F. Supp. 3d 47, 61 (D.D.C. 2024), affidavits that are "conclusory [or] merely reciting statutory standards" cannot carry the agency's burden on summary judgment, *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998) (citation omitted). Here, the agency asks the court to assume that all the reporting entities actually and customarily treat the three withheld categories of information as confidential merely because they requested confidential treatment in accordance with the agency's regulations, and NHTSA granted those requests. This will not do.

To be sure, these confidential treatment requests and subsequent determinations are *indicative* of the entities' actual and customary treatment, but they are not, without more, sufficient grounds to conclude that the agency met its burden under FOIA. *See Ctr. for Auto Safety v. Dep't of Treasury*, 133 F. Supp. 3d 109, 130 (D.D.C. 2015). Indeed, "[i]f the Court were to accept [the] defendant's argument, any agency could, theoretically, simply hand out promises of confidentiality to individuals who gave information in order to avoid judicial review as to whether a record can be withheld." *Id.* (quoting *Dow Jones Co. v. FERC,* 219 F.R.D. 167, 178 (C.D. Cal. 2003)). Rather, it is the court's duty to review de novo whether the agency properly withheld information under FOIA. *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.,* 777 F.3d 518, 522 (D.C.

Cir. 2015). It cannot do so in these circumstances, where the agency asks the court to simply take it at its word that its initial confidential treatment approval was proper.

Moreover, in determining whether information withheld pursuant to Exemption 4 is customarily kept private, "the court will consider how the *particular* party customarily treats the information, not how the industry as a whole treats the information." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 148 (D.C. Cir. 2001) (citing *Critical Mass*, 975 F.2d at 872, 878–80) (emphasis added). Under *Argus Leader*, agencies must also demonstrate that a reporting entity "actually" keeps the withheld information private. 588 U.S. at 440. How Tesla treats its version data, ODD information, and narratives of the crash events, however, tells the court nothing about how other individual manufacturers actually and customarily treat their own information. Notably, NHTSA fails to even name other reporting entities beyond Tesla in its briefing on Exemption 4. *See* NHTSA Mot. at 8–14.

On this record, the court cannot definitively conclude that NHTSA has carried its burden to justify withholding information submitted by reporting entities other than Tesla under Exemption 4 and will deny the parties' summary judgment motions on this issue.

### ii.  *Information Submitted by Tesla*

To justify their withholding of information pursuant to Exemption 4, agencies may also rely on third-party affidavits or declarations, which tend to "carry more weight on the custom issue." *Jud. Watch, Inc. v. U.S. Dep't of Com.*, 337 F. Supp. 2d 146, 171 (D.D.C. 2004). Taken together, Defendants' declarations satisfy the agency's burden in establishing these conditions regarding information submitted by Tesla because Tesla's own submission fills the factual gaps in the agency's declaration. Specifically, Tesla's Director for Field Reliability Engineering, Eddie Gates, avers that "Tesla customarily and actually treats each of [the contested] three categories of

information as technical and proprietary information," Gates Decl. ¶ 19, and substantiates these claims by describing how "Tesla provides these three categories of information to NHTSA with the understanding and expectation . . . that this information will remain confidential" and how Tesla "always" seeks confidential treatment for these fields. *Id.* ¶¶ 21, 23. Gates further explains that "Tesla does not disclose this information publicly in the ordinary course of its business," *id.* ¶ 19, that employees with access to the information in the incident reports "are subject to non-disclosure agreements and associated security protocols directed at preventing dissemination of this information outside of Tesla," *id.* ¶ 22, and that "access is given to only certain employees who need access to the Incident Reports as part of their job function," including "Tesla's accident investigation team, Autopilot subject matter experts specific to accident investigation & regulatory reporting, and certain members of [Tesla's] legal department," *id.*; *see also* June 2, 2022 Tesla Request for Confidential Treatment, ECF No. 25-6.

The Post responds that these descriptions are too "vague" and "generalized" to satisfy the agency's burden, *see* Post Mot. at 12–13, but courts, including the Supreme Court, have found such descriptions sufficient to satisfy Exemption 4's confidential treatment requirement. *See Argus Leader*, 588 U.S at 434 (concluding that there was "no question" about the submitting entity's confidential treatment of the requested information where "uncontested testimony established that the Institute's retailers customarily do not disclose" the information or "make it publicly available in any way" and "only small groups of employees usually have access to it" (cleaned up)); *see also Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 110–11 (D.D.C. 2019) (explaining that a declarant may establish knowledge of a submitter's custom "by relaying that the submitters themselves told the agency that the information is confidential . . . [or] by indicating that the agency reached an understanding with the submitters

that the information would be held in confidence by the U.S. and not publicly divulged" (cleaned up)); *Greenspan v. Dep't of Transp.*, No. 22-cv-280, 2025 WL 2591784, at *2 (D.D.C. Sept. 8, 2025) (citing Tesla's non-disclosure agreements, measures to guard against disclosure of the requested information, and assurances of confidentiality as sufficient evidence of actual and customary confidential treatment).

In addition to challenging the sufficiency of Defendants' evidence, the Post also challenges their representations regarding Tesla's confidential treatment of the requested information, contending, mainly, that the information contained in these fields is, in fact, disclosed publicly or otherwise easily discernable by individual drivers. For instance, regarding the first category of requested information—the hardware and software version utilized by the vehicles involved in accidents—the Post argues that Tesla drivers involved in reported accidents can access this information through their Tesla phone applications or via their car's touch screen. *See* Post Mot. at 14 ("Tesla freely discloses this very information to Tesla drivers, who can in turn share it even more widely, and without restriction."). Notably, Defendants do not contest this observation. *See* NHTSA Combined Opp'n to the Post's Mot. and Reply in Supp. of Summ. J. ("NHTSA Opp'n") at 3, ECF No. 31; Tesla Combined Opp'n to the Post's Mot. and Reply in Supp. of Summ. J. ("Tesla Opp'n") at 9, ECF 29. According to Defendants, however, "[t]he inquiry is not whether in the abstract, a single driver has access to version information related to his or her own vehicle; rather, the proper inquiry is focused on whether the relevant information in the requested record— Tesla's aggregated safety related data—are non-public and customarily treated as confidential." Tesla Opp'n at 7; *see also* NHTSA Opp'n at 3 ("[T]he point is not merely that a driver could identify their own hardware and software version, but that disclosure by the Agency in this format would connect specific hardware and software versions to specific crashes.").

The court agrees with Defendants' reading of Exemption 4 jurisprudence and the nature of the requested information.  As the D.C. Circuit has explained, "[t]he fact that [a car part] can be bought on the open market and inspected certainly does not establish that information describing the physical characteristics of every vehicle produced over many years is customarily disclosed." *Ctr. for Auto Safety*, 244 F.3d at 151 (rejecting plaintiff's contention that because the information sought related to products sold on the open market, the information was publicly available).  As Defendants note, "the specific nature of the disclosure here—linking the version information to a vehicle accident—is different from the information that any individual driver might be able to access from within their vehicle."  NHTSA Opp'n at 3.

The Post's theory contravenes this straightforward precedent by essentially permitting the disclosure of privately held data sets simply because certain individual data points are known to a subset of consumers.  The court declines to adopt this fragmented approach, which ignores the fact that the version data is "accompanied on the spreadsheet by several other relevant datapoints," Tesla Mot. at 9, including the most fundamental data point—that each of these accidents occurred. As a result, the disclosure of this field "would necessarily imply or 'reveal [other] information that' itself meets all three Exemption 4 prongs," such as the crash rates of vehicles equipped with specified automation technology.  *Renewable Fuels Ass'n v. United States Env't Prot. Agency*, 519 F. Supp. 3d 1, 7 (D.D.C. 2021).

As for NHTSA's withholding of information regarding whether the vehicles involved in accidents were operating within their ODD, Defendants rely on the same declarations identified above.  *See* NHTSA Mot. at 11–12 (citing Gates Decl. ¶¶ 19, 23; Kuppersmith Decl. ¶¶ 15, 21, 25).  The court finds that these statements also suffice to demonstrate that Tesla customarily and actually treats the ODD information as confidential.  Although the court shares the Post's

confusion as to *why* Tesla would need to hold such information privately, given Tesla's assertion that "the ODD for a Tesla vehicle is essentially any roadway in America in which the driver is comfortable," Tesla Mot. at 5; *see also* Gates Decl. ¶ 30 ("Tesla does not currently offer an ADS system that is restricted to a given ODD."),[4] and the seemingly limited nature of potential responses to the field, *see* Post Reply in Supp. of Summ. J. ("Post Reply") at 4 (stating that the only possible answers Tesla could offer to the "Within ODD?" question are (1) "Yes," (2) "No, see Narrative," or (3) "Unknown, see Narrative"), ECF No. 33, Defendants need only "show that information is 'customarily and actually treated as private by its owner,' not necessarily why it is so treated," *CREW*, 58 F.4th at 1270 (quoting *Argus Leader*, 588 U.S. at 440).  Moreover, as noted above, it is the document provider's custom, not the industry custom, that matters.  *See Ctr. for Auto Safety,* 244 F.3d at 148.

Lastly, with regard to the information reported in the narrative field, the court finds that Defendants' declarations also suffice to carry the agency's burden in demonstrating that Tesla actually and customarily treats this information as private.  The Post largely repeats its earlier arguments in challenging the agency's withholding of information contained in the narrative field—that "the driver, passenger, or any observer(s) of the crash would be free to share that information publicly," and that such observations are "widely reported in the press."  Post Mot. at 15.  But, as noted above, Tesla avers that it does not publicly disclose its crash narrative information, let alone compilations of that information.  *See* Gates Decl. ¶¶ 19–22, 26.  And, outside of a small subset of information that is not being withheld, NHTSA concurs with Tesla's

---

[4] Tesla claims its responses to this field are "inextricably intertwined with the narrative field" because they refer to and incorporate information contained in the narrative category.  Tesla Opp'n at 10.  But that does not explain Tesla's reasons for treating its ODD information as confidential.  In any event, as noted above, this issue is not before the court.

characterization.   Kuppersmith Decl. ¶¶ 21, 25.   That drivers involved in accidents, public witnesses, or media outlets may ascertain limited information regarding individual accidents does not undermine Tesla's claims that it treats its narrative information of reported accidents as confidential.  *Cf. Humane Soc'y of United States v. U.S. Dep't of Agric.*, 549 F. Supp. 3d 76, 88 (D.D.C. 2021) (finding that the submitter did not treat the withheld information as confidential because the information he claimed to be private was published on his website).  Moreover, while the Post reasonably points out that Tesla's narrative fields often contain data points, such as road conditions and source information, that would otherwise be publicly available through categories for which NHTSA does not permit redaction, Post Mot. at 15, this assertion is more relevant to the court's inquiry into whether the government provided any assurance of confidential treatment, as addressed below.

### b.  Government Assurances of Confidentiality

Without clear guidance from the Supreme Court or the D.C. Circuit, it remains unsettled whether, in addition to demonstrating that the requested information is customarily and actually treated as private, agencies must also demonstrate that submitting entities provided their information under assurances of confidentiality in order withhold such information under Exemption 4.  *See CREW*, 58 F.4th at 1269 (Circuit stating that it would "not decide whether the second condition must be met, because CREW does not dispute the point for purposes of this appeal").

The court nonetheless concurs with numerous other courts in this district that the government's assurances of confidentiality are, at minimum, "relevant to the confidentiality analysis." *Farm Lab. Org. Comm. v. U.S. Dep't of Lab.*, No. 20-cv-645, 2025 WL 2105566, at *3 (D.D.C. July 28, 2025) (collecting cases).

As the Post points out, the Standing Order expressly warns reporting entities that the government will not keep most submitted information confidential and merely provides a *process* through which submitters may seek confidential treatment for the three enumerated categories of information. *See* Standing Order at 15 ("Making a request for confidential treatment does not ensure that the information claimed to be confidential will be determined to be confidential"); *see also* 49 C.F.R. pt. 512 (establishing "the procedures and standards by which NHTSA will consider claims that information submitted to the agency is entitled to confidential treatment"). That such a process exists, however, militates against finding an "express statement by the agency that it would *not* keep the relevant categories of information private, or a clear implication to that effect." *Renewable Fuels*, 519 F. Supp. 3d at 12–13 (cleaned up).

The regulations themselves default to confidential treatment of information that submitters claim to be confidential "until the Chief Counsel makes a determination regarding its confidentiality." 49 C.F.R. § 512.20(a); *see id.* § 512.23(a)(4) ("No information will be disclosed . . . unless the submitter of the information is given written notice."). And although NHTSA has denied Tesla's requests on occasion, *see* Kuppersmith Decl. ¶ 21, the agency's practice of "routinely" granting Tesla's requests, with few exceptions, established reasonable and actual reliance interests on Tesla's part. *See* Gates Decl. ¶¶ 23 ("Tesla provides these three categories of information to NHTSA with the understanding and expectation, based in part on the terms of the SGO, that this information will remain confidential."), *id.* ¶ 24 (NHTSA has routinely granted Tesla's requests for confidential treatment). In addition, while the court agrees with the Post's position that any assurances of confidentiality did not extend to portions of Tesla's narrative responses reflecting categories of information that are ineligible for confidential treatment, *see* Post Mot. at 15 (citing Tesla Mot. at 17), Kuppersmith avers that the agency denied Tesla's

requests to redact this type of embedded information for this precise reason.  *See* Kuppersmith Decl. ¶ 21.

Consequently, the court finds that there is no genuine dispute of material fact over whether Tesla actually and customarily treats as confidential its versions data, ODD information, and crash narratives such that summary judgment is appropriate on this issue.

### 2.  Foreseeable Harm

Under the FOIA Improvement Act, agencies may only withhold requested information pursuant to certain exemptions, including Exemption 4, if "the agency reasonably foresees that disclosure would harm an interest protected by" the invoked exemption.   5 U.S.C. § 552(a)(8)(A)(i)(I).  To meet this standard, the agency must "articulate both the nature of the harm [from release] and the link between the specified harm and specific information contained in the material withheld."  *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (internal quotation marks omitted).  Though the precise contours of Exemption 4's protected interests are not yet strictly defined, particularly in light of the Supreme Court's ruling in *Argus Leader, see Shteynlyuger v. Centers for Medicare & Medicaid Servs.*, 698 F. Supp. 3d 82, 123 (D.D.C. 2023) (explaining that "few courts have considered what burden the foreseeable-harm requirement imposes on agencies that seek to withhold records pursuant to Exemption 4" and noting the "open question as to the scope of the interest Exemption 4 seeks to protect"), courts in this district appear to agree that disclosure would need to pose "genuine harm to the submitter's economic or business interests . . . thereby dissuading others from submitting similar information to the government."  *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 113 (cleaned up). Agencies may satisfy the foreseeable harm requirement "on a category-by-category basis rather than a document-by-document basis," i.e., by "'group[ing] together like records' and explain[ing]

the harm that would result from release of each group." *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369 (citation omitted).

Here, NHTSA reasonably determined that disclosure of the version data and narrative categories of information would cause "genuine harm to the submitter's economic or business interests . . . thereby dissuading others from submitting similar information to the government." *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 113 (cleaned up). But a genuine dispute of material fact exists over whether disclosure of Tesla's ODD information would result in reasonably foreseeable harm.[5]

According to the Gates Declaration, disclosure of Tesla's hardware and software versions would permit competitors to "assess the efficacy of a given version of hardware or software," "calculate the number of crashes per the different software and hardware systems" and "thereby draw conclusions as to Tesla's rate of progress," as well as "use crash information for a given hardware or software version to disparage Tesla." Gates Decl. ¶ 29. Gates also avers that disclosure of the intertwined ODD and narrative information will allow competitors to:

> (a) [S]ee the processes by which Tesla identifies and examines crash incidents; (b) gain insights into how Tesla learns and evolves through data collection; (c) track the pace of improvement in ADAS features over time; (d) draw conclusions as to the effectiveness of one ADAS version over another; (e) draw conclusions about or attempt to copy Tesla's internal processes; (f) reveal how and in what circumstances Tesla gathers and learns from telematic or other data relating to crash events; (g) provide insights into how Tesla's software and vehicle technology works; and (h) ascertain the strength and weaknesses of Tesla's features and use that knowledge to build or improve their own features and systems.

*Id.* ¶ 32. Disclosure of the narrative field, according to Gates, would also make customers less likely to allow information sharing with Tesla since that field implicates driver behavior in the

---

[5] The court will not address the reasonably foreseeable harm standard regarding information submitted by entities other than Tesla because, as set forth above, the agency has failed to make a sufficient showing that such information is "confidential" to justify withholding it pursuant Exemption 4.

event of an accident, which would in turn impede Tesla's ability to investigate crashes and assess improvements. *Id.* ¶¶ 26, 33.

Given these concerns, as articulated in Tesla's requests for confidential treatment, *see id.* ¶ 36; *Vaughn* Index at 32–197, NHTSA "determined that it was reasonably foreseeable that publicly releasing the information would harm the reporting entities' commercial or financial interests in keeping the information private" and that "reporting entities would be less forthcoming with the agency going forward if they knew NHTSA would disclose their confidential information." Kuppersmith Decl. ¶¶ 20, 28. According to the agency, disclosure would therefore harm NHTSA's own interest in obtaining information "necessary for its safety mission." *Id.* ¶ 20.

The Post counters that Defendants proffer mere "speculation" of harm through "nearly identical boilerplate statements and generic and nebulous articulations of harm" as to each of the withheld categories of information. Post Mot. at 17. The court is inclined to agree insofar as NHTSA's declaration fails to differentiate between the harm associated with each category of information, *see* Kuppersmith Decl. ¶ 20. *Reps. Comm. for Freedom of the Press*, 3 F.4th at 369 (explaining that "the basis and likelihood of [the claimed] harm must be independently demonstrated for each category" (citation omitted)). Nonetheless, Tesla's declaration, for the most part, is the type of "focused and concrete" explanation that courts require. *Id.* at 370.

The Post also argues that Defendants' evidence fails to show how disclosure of each individual category would result in the requisite harm. Post Mot. at 18–19. With respect to version data, the Post disputes that disclosure of this information "will allow competitors to assess their efficacy and calculate the number of reportable incidents per system, which in turn will allow it to determine Tesla's rate of progress," Tesla Mot. at 16, because that information is "*already* discernible from the publicly reported vehicle makes and models and dates of the incidents." Post

Mot. at 18 (emphasis in original).  The Post also contends that Defendants do not explain how knowledge of Tesla's rate of progress would harm Tesla, given its leading position in the field of automation technology.  *Id.*  These arguments fail to appreciate the nature of information at issue. As Tesla's declarant explained, the information reported in this category "includes (a) the ADAS software system (e.g., Autopilot, Enhanced Autopilot, or Full Self-Driving (Supervised)); (b) the version of hardware on the vehicle (e.g., HW2, HW3, HW4); and (c) the version of the ADAS software on the vehicle (software versions are updated through over-the-air updates on a regular basis)."  Gates Declaration ¶ 28.  That the make and model of a vehicle involved in a crash is publicly disclosed does not reveal what version technology those vehicles used, let alone discloses information regarding their safety performance over time.  Moreover, Tesla's leading position in this field is precisely *why* competitors may seek to draw inferences regarding Tesla's hardware and software versions' safety performance.

As for the ODD information, the Post asserts that because "Tesla claims that the ODD encompasses 'essentially any roadway in America,'" "there are no conceivable insights that competitors could gain from ODD information about any particular Tesla crash."  Post Mot. at 19 (quoting Tesla Mot. at 5).  The Post makes a compelling argument, and Defendants largely failed to address it, relying instead on Tesla's statement that ODD entries "refer[] to the narrative," Gates Decl. ¶ 30.  *See* Tesla Mot. at 16 ("Disclosure of the narratives, which refer to ODD, will also result in commercial, financial, and competitive harm"); Tesla Opp'n at 17–19 (only addressing Plaintiff's arguments as to version data and narrative information).  Indeed, the Gates Declaration raises numerous concerns regarding the disclosure of ODD data, but only *in combination with* the narrative information.  *See* Gates Declaration ¶ 32.  And although "the mere recitation of similar reasoning in showing harm" for separate categories of information is not necessarily fatal to

Defendants' claims of foreseeable harm, *Leopold v. U.S. Dep't of Justice*, No. 19-cv-2796, 2021 WL 3128866, at *4 (D.D.C. July 23, 2021), Defendants' problem is that Tesla's theory of harm as to the disclosure of ODD information fails to establish a sufficient nexus between the claimed harm and the nature of its ODD entries, particularly in light of the Post's uncontested observation that "the only possible answers Tesla could offer to the 'Within ODD?' question are (1) 'Yes,' (2) 'No, see Narrative,' or (3) 'Unknown, see Narrative.'" Post Reply at 4.

Of course, it is unsurprising that Defendants' proffered explanations recycle the same or similar harms associated with the disclosure of each category of information because "the likelihood of substantial competitive injury can increase disproportionately as more information is released" where the "disclosure of multiple types of information provides a more comprehensive picture." *People for the Ethical Treatment of Animals v. United States Dep't of Health & Hum. Servs.*, 901 F.3d 343, 354 (D.C. Cir. 2018). But given the limited nature of the information contained in the ODD field, a genuine dispute of material fact exists regarding whether disclosure of this information would cause reasonably foreseeable harm to Tesla's economic and business interests. Consequently, summary judgment for either party on the agency's withholding of ODD information is improper.

Finally, the Post asserts that Defendants do not show a "link" between disclosure of the narrative fields and competitive harm because Tesla "fails to explain how that information, in the hands of a competitor, would cause Tesla harm." Post Mot. at 19. Specifically, the Post argues that Defendants' declarations do not explain how information in the narrative responses, such as "the specific ADAS that was engaged," "the events surrounding the incident," and "the driver's behavior," would harm Tesla if placed "in the hands of a competitor." Post Mot. at 19 (cleaned up). But the Gates Declaration addresses exactly that. Specifically, Gates states that Tesla

"collects, diagnoses, and analyzes data from its ADAS fleet of vehicles, including data about safety critical events that are reported in Incident Reports" "[t]o help improve its ADAS systems and maintain its competitive edge." Gates Decl. ¶ 26. And, as noted above, disclosure of this information would allow competitors to, *inter alia,* "gain insights into how Tesla learns and evolves through data collection," "draw conclusions about or attempt to copy Tesla's internal processes," and "ascertain the strength and weaknesses of Tesla's features and use that knowledge to build or improve their own features and systems." *Id.* ¶ 32; *see Greenspan*, 2025 WL 2591784, at *5 (accepting as sufficient Tesla's declaration that public disclosure of its data logs, which reveal "the type of information Tesla is able to collect from vehicles, how the data is collected and in what format, and how Tesla can use vehicle data to evaluate field incidents," "would enable competitors to improve their own data collection practices and ultimately improve their products and customer experience" (internal quotations and citations omitted)).

Moreover, the court is reluctant to accept the Post's contention that the *only* cognizable harms for the purposes of Exemption 4 are those "flowing from the affirmative use of proprietary information by competitors." Post Mot. at 20 (quoting *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1291 n.30 (D.C. Cir. 1983) (cleaned up)). As noted above, neither the Supreme Court nor the D.C. Circuit have conclusively defined the scope of Exemption 4's protected interests following *Argus Leader*. Nor did the *Argus Leader* court have occasion to address the reasonably foreseeable harm standard, since the underlying dispute pre-dated Congress' passage of the FOIA Improvement Act. *See Seife v. United States Food & Drug Admin.*, 43 F.4th 231, 241 (2d Cir. 2022). Thus, it remains an open question as to what overlap, if any, exists between the D.C. Circuit's prior "substantial competitive harm" standard, which the Court rejected insofar as

it relates to defining what information is "confidential," and the FOIA Improvement Act's reasonably foreseeable harm standard.

Nonetheless, courts in this district have generally agreed that agencies may meet their burden by demonstrating how disclosure of the requested information would harm "the submitter's economic or business interests," *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 113, including instances where it "could lead to harassment" or "cost [submitting entities] business," thereby forcing the submitters from the market, *CREW v. U.S Dep't of Just.*, 728 F. Supp. 3d 113, 126 (D.D.C. 2024), "could disadvantage [it] and provide an unfair advantage to its competitors," *Leopold v. U.S. Dep't of Justice*, No. 19-cv-3192, 2021 WL 124489, at *7 (D.D.C. Jan. 13, 2021), or "would harm [a submitting entity's] business interests and competitive standing," *Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. 23-cv-00928, 2025 WL 947472, at *9 (D.D.C. Mar. 28, 2025).  This approach is consistent with Justice Breyer's partial concurrence in *Argus Leader*, which disagreed with the majority's holding that Exemption 4 imposes no "harm requirement" but nonetheless recognized that "disclosure of confidential information can cause a business serious harm in ways not so directly linked to competition," such as "discourag[ing] customers from using a firm's products . . . without substantial effect on its rivals."  *Argus Leader*, 588 U.S. at 441–42 (Breyer, J., concurring).

The court sees no logical or legal reason to depart from the emerging consensus of judges in this district.[6]  And there can be little doubt that information regarding the circumstances surrounding car accidents that occurred when certain versions of Tesla's autonomous technology were used would foreseeably harm its "economic or business" interests and discourage thorough

---

[6] For the same reason, the court also rejects Tesla's suggestion that Defendants need only demonstrate reasonably foreseeable harm to the confidentiality of the information itself.  *See* Tesla Mot. at 15.

future disclosures, regardless of whether that information is utilized by competitors or consumers. *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 113. Despite the Post's arguments to the contrary, Defendants' declarations suffice to demonstrate that the agency "specifically and thoughtfully determined that it reasonably foresees that disclosure" of narrative information would be harmful. *Greenspan*, 2025 WL 2591784, at *5 (internal quotations and citations omitted).

In sum, while the court cannot definitively conclude that the agency has met its burden of showing reasonably foreseeable harm to interests protected under Exemption 4 upon the disclosure of Tesla's ODD entries, it does conclude that summary judgment is appropriate on this issue as to the version data and narrative categories.

### 3. Exemption 6

In addition to challenging NHTSA's application of Exemption 4, the Post also contests the agency's withholding of certain information pursuant to Exemption 6. Though NHTSA identified several categories of information it withheld under Exemption 6, it appears that the Post only seeks review of the agency's refusal to disclose information about the specific location of the reported crashes, including the latitude, longitude, address, and zip code of the accidents.[7]

Under Exemption 6, agencies may permissibly withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "The term 'similar files' is construed broadly to cover '[a]ll information which applies to a particular individual . . . , regardless of the type of file in which it

---

[7] For instance, the agency also withheld the last six digits of the VIN, certain signatures, the personal identifying information of the crash investigator, the exact date the incident occurred, and when the reporting entity received notice of the incident, Humphrey Decl. ¶¶ 13, 15, 16, but the Post has not proffered any meaningful argument about those withholdings. *See Hopkins v. Women's Div., Gen. Bd. Of Glob. Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) (explaining that arguments not raised in plaintiff's opposition may be deemed conceded by the court).

is contained.'"[8] *People for Ethical Treatment of Animals v. Dep't of Health & Hum. Servs.*, 464 F. Supp. 3d 385, 393 (D.D.C. 2020) (quoting *Milton v. U.S. Dep't of Just.*, 783 F. Supp. 2d 55, 58 (D.D.C. 2011)).  The purpose of this exemption is "'to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information.'" *Prison Legal News v. Samuels*, 787 F.3d 1142, 1147 (D.C. Cir. 2015) (quoting *Jud. Watch, Inc. v. U.S. Dep't of. Just.*, 365 F.3d 1108, 1124 (D.C. Cir. 2004)).  Thus, in assessing whether nondisclosure pursuant to Exemption 6 is appropriate, agencies and courts must weigh "the privacy interests that would be compromised by disclosure against the public interest in release of the requested information." *Beck v. U.S. Dep't of. Just.*, 997 F.2d 1489, 1491 (D.C. Cir. 1993) (quoting *Davis v. U.S. Dep't of. Just.*, 968 F.2d 1276, 1281 (D.C. Cir. 1992)).  Only information that "sheds light on an agency's performance of its statutory duties" is in the public interest.  *Reps. Comm. for Freedom of Press*, 489 U.S. at 743.

According to NHTSA, "the privacy interest is extraordinarily strong, as it applies to individual drivers and third-party owners and operators of vehicles, who have a substantial interest in their personal privacy, including their address and financial details."  NHTSA Mot. at 16.  In particular, the agency's declarant avers that releasing crash location information, in conjunction with the unredacted information, "would allow others, with few additional steps (e.g., a simple internet search), to identify individuals and/or derive the personally identifiable information ('PII') of individuals involved in a crash incident."  Humphrey Decl. ¶ 13; *see also Vaughn* Index at 39–197.  In the declarant's view, this would open individuals to exploitation for commercial or private gain and potentially "subject[] [them] to unwanted intrusion into their experiences and solicitation,

---

[8] The Post also does not challenge NHTSA's contention that the nature of the withheld location data qualifies as "similar files" for Exemption 6 protections.  NHTSA Mot. at 15–16; Post Mot. at 21–25.

harassment, and contact by the media, attorneys, and other interested parties." Humphrey Decl. ¶ 19. The Post counters that individuals lack any privacy interest in the location data of car accidents reported on NHTSA's spreadsheet because those accidents occurred on publicly accessible roads and the identities of drivers may already be revealed in law enforcement reports or news articles. Post Mot at 21–23. The court concludes that a genuine dispute of material fact exists regarding the extent to which disclosure of precise crash location data implicates individuals' privacy interests.

As the D.C. Circuit has explained, the "privacy interest at stake may vary depending upon the context in which it is asserted." *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 582 (D.C. Cir. 1996). Here, the information about the precise location of the reported accidents exists in the aggregate on a spreadsheet accompanied by other data points, "such as vehicle make and model, city, and state." Humphrey Decl. ¶ 15; *see Vaughn* Index at 39–197. The court also credits the agency's explanation that disclosure of this information would permit others to then ascertain the identity of those individuals through "few additional steps," including "a simple internet search," Humphrey Decl. ¶¶ 13, 15, which could, in turn, lead to their harassment or unwanted solicitation, *id.* ¶ 19.

Yet, as the Post points out, individuals' privacy interests are often diminished when the information they seek to protect is already freely available to the public. *See Am. C.L. Union v. Dep't of Just.*, 655 F.3d 1, 8–9 (D.C. Cir. 2011) ("*ACLU I*"). For instance, in *ACLU I*, the D.C. Circuit explained that an individual's privacy interest for the purposes of Exemption 7(C) withholding was not "much more" than "de minimis" where "[n]either the specific list actually at issue, nor information that might be derived from . . . information on that list, will disclose personal information that is not already publicly available and readily accessible to anyone who

might be interested in it." *Id.* at 12.  Nor would disclosure "make that information any more accessible than it already is through publicly available computerized databases." *Id.*  Notably, "'Exemption 7(C) is more protective of privacy than Exemption 6' and . . . establishes a lower bar for withholding material." *Id.* at 6 (quoting *U.S. Dep't of Def. v. FLRA,* 510 U.S. 487, 496 n.6 (1994).

Thus, even if the court accepts NHTSA's proffered explanation, the privacy interests at stake here appear, at most, barely greater than de minimis because the requested spreadsheet data is not, in and of itself, identifying.  Moreover, the only specified method by which interested parties may ascertain the identities of drivers involved in reported accidents requires them to find such information through publicly available means, which would presumably also reflect the fact that these individuals were involved in car accidents.  *See* Humphrey Decl. ¶ 19; *cf. Ctr. For Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 809 F. Supp. 148, 149 (D.D.C. 1993) (finding sufficiently significant private interest in records containing names and addresses of individuals who had complained to NHTSA about auto safety problems because disclosure could lead to unwanted solicitation and potential intrusion on personal and upsetting information regarding their injuries).

On the other hand, the public interest that the Post has identified is not insignificant. Specifically, it explains that disclosure of precise location data would permit interested entities to assess the accuracy of reported crash information and fill any remaining gaps in self-reported data that may be causing the agency to miss important insights regarding the safety of driver-assistance technologies.  Post Mot. 23–25.  According to the Post, such disclosure would, in turn, foster public assessment of NHTSA's performance of its duty "to reduce traffic accidents and deaths and injuries resulting from traffic accidents," 49 U.S.C. § 30101, particularly given the agency's stated

concerns regarding the "rapid evolution" of automated driving technology and the "testing of new technologies and features on publicly accessible roads," Standing Order at 3. In response, NHTSA merely insists that the public lacks an interest in the disclosure of personal identifying information, NHTSA Mot. at 17–18, and maintains that it "has robust enforcement authorities that enable the agency to investigate deficiencies in reporting, such as inaccurate or incomplete reports." NHTSA Opp'n at 11.

Neither the record nor the agency's explanation definitively reveals "[w]hat incremental privacy interest attaches" to the withheld location data, "independent of the 'scattered bits of information' in the public realm." *Jud. Watch, Inc. v. U.S. Dep't of Just.*, 898 F. Supp. 2d 93, 105 (D.D.C. 2012). And without such information, the court cannot discern the full extent of the privacy interests at stake nor properly weigh those interests against the public's. *See, e.g., Tokar v. U.S. Dep't of Just.*, No. 16-cv-2410, 2019 WL 6910142, at *7 n.10 (D.D.C. Dec. 19, 2019) ("Because the nature of privacy interests is unclear at this point, the Court is unable to proceed to the next step of the analysis and weigh them against the public interest in disclosure."). The court therefore denies the parties' summary judgment motions with respect to the agency's application of Exemption 6.

### 4. Segregability

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt" from disclosure. 5 U.S.C. § 552(b). "[B]efore approving the application of a FOIA exemption," district courts "must make specific findings of segregability regarding the documents to be withheld." *Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) (internal quotations and citation omitted). For those findings, "[a]gencies are entitled to a presumption that they

complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). Agencies must nonetheless provide "a 'detailed justification' for its non-segregability" but need not "provide so much detail that the exempt material would be effectively disclosed." *Johnson v. Exec. Office for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977)). Based on the court's determinations above, the only relevant segregability inquiry pertains to NHTSA's withholding of Tesla's version data and narrative information pursuant to Exemption 4. The court finds that the agency has met its burden.

Specifically, NHTSA's Exemption 4 declarant avers that the agency conducted a "line-by-line review of the documents withheld in full or in part" and confirmed "that further segregation of these records would cause foreseeable competitive harm to the reporting entities . . ." Kuppersmith Decl. ¶ 28. For its part, the agency did, in fact, disclose certain portions of the narratives in instances where it determined that such information was "identified in other sections of the incident report in which NHTSA does not permit" requests for confidential treatment, where Tesla's CEO "made a public statement regarding the crash that was the subject" of the entries, and where the agency concluded that disclosure would not reasonably cause harm. *Id.* ¶ 21. These statements, coupled with the agency's *Vaughn* Index, suffice to show that the agency complied with its segregability obligations with regard to the categories of information it permissibly withheld. *See Loving v. Dep't of Def.,* 550 F.3d 32, 41 (D.C. Cir. 2008)*; Porup v. CIA*, 997 F.3d 1224, 1239 (D.C. Cir. 2021).

## IV.    CONCLUSION

In light of the above analysis, the court will GRANT in part and DENY in part Defendants' Motions for Summary Judgment and DENY Plaintiff's Cross Motion for Summary Judgment

without prejudice.  The court will nonetheless permit Defendants to supplement their declarations

to address the court's stated concerns regarding NHTSA's application of Exemptions 4 and 6.

Date: March 25, 2026

_Tanya S. Chutkan_

TANYA S. CHUTKAN
United States District Judge